## MITCHELL v. TRAWLER RACER, INC.

No. 176.   Argued January 21, 1960.—Decided May 16, 1960.

*Morris D. Katz* argued the cause and filed a brief for petitioner.

*James A. Whipple* argued the cause for respondent. With him on the brief was *Paul J. Kirby.*

Briefs of *amici curiae* urging reversal were filed by *Samuel A. Neuburger,* by *Arthur J. Mandell,* and by *Philip F. DiCostanzo.*

*Walter E. Maloney, Thomas E. Byrne, Jr., M. L. Cook, J. Ward O'Neill, Louis J. Gusmano* and *James M. Estabrook* filed a brief for the American Merchant Marine Institute, Inc., as *amicus curiae,* urging affirmance.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner was a member of the crew of the Boston fishing trawler *Racer,* owned and operated by the

respondent. On April 1, 1957, the vessel returned to her home port from a 10-day voyage to the North Atlantic fishing grounds, loaded with a catch of fish and fish spawn. After working that morning with his fellow crew members in unloading the spawn,[1] the petitioner changed his clothes and came on deck to go ashore. He made his way to the side of the vessel which abutted the dock, and in accord with recognized custom stepped onto the ship's rail in order to reach a ladder attached to the pier. He was injured when his foot slipped off the rail as he grasped the ladder.

To recover for his injuries he filed this action for damages in a complaint containing three counts: the first under the Jones Act, alleging negligence; the second alleging unseaworthiness; and the third for maintenance and cure. At the trial there was evidence to show that the ship's rail where the petitioner had lost his footing was covered for a distance of 10 or 12 feet with slime and fish gurry, apparently remaining there from the earlier unloading operations.

The district judge instructed the jury that in order to allow recovery upon either the negligence or unseaworthiness count, they must find that the slime and gurry had been on the ship's rail for a period of time long enough for the respondent to have learned about it and to have removed it.[2] Counsel for the petitioner requested that

---

[1] In accordance with tradition, the employment agreement provided that the proceeds from the sale of the fish spawn should be divided among the members of the crew, no part thereof going to the officers or to the owner of the vessel.

[2] The instructions on this aspect of the case were as follows: "In a case like this we have the argument presented here, which you do not have to believe, that the ship was unseaworthy because at the time of the injury there was on the rail of the ship some kind of slime. Well, if that really was there and had been there any period of time, and it caused the accident, then you would find as

the trial judge distinguish between negligence and unseaworthiness in this respect, and specifically requested him to instruct the jury that notice was not a necessary element in proving liability based upon unseaworthiness of the vessel. This request was denied.[3] The jury awarded the petitioner maintenance and cure, but found for the respondent shipowner on both the negligence and unseaworthiness counts.

---

a matter of your conclusion of fact, that unseaworthiness caused the accident.

"I haven't told you what unseaworthiness is. You will recognize it is somewhat overlapping and alternative to, indeed quite similar to, negligence because it is one of the obligations of the owner of a ship to see to it through appropriate captains, mates, members of the crew, or someone, that there isn't left upon the rail of a ship, especially a rail which is going to be utilized for leaving the ship, to climb the ladder, any sort of substance such as slime.

"It doesn't make any difference who puts it there. As far as the owner-operator of the vessel goes, it is his job to see it does not stay there too long, if he knows it is the kind of place, as he could have known here, which is used by members of the crew in getting off the ship.

"So I think it would be fair to tell you the real nub of this case which I hope has not been clouded for you, the real nub of this case is, Was there on the rail some slime; was it there for an unreasonably long period of time; was there a failure on the part of the owner-operator through appropriate agents to remove it; and was that slime the cause of the injury which the plaintiff suffered.

.     .     .     .     .

"Was there something there and was it there for a reasonably long period of time so that a shipowner ought to have seen that it was removed? That is the question."

[3] "Mr. Katz: May I make a further request? In your charge you specifically said 'and was it there for a reasonably long period of time so that the shipowner could have had it removed.'

"I submit that would apply to the negligence count only but with respect to unseaworthiness, if there is an unseaworthy condition, there is an absolute situation, there is no time required. It is the only—

"The Court: Denied. Refer to the case in the Second Circuit."

An appeal was taken upon the sole ground that the district judge had been in error in instructing the jury that constructive notice was necessary to support liability for unseaworthiness. The Court of Appeals affirmed, holding that at least with respect to "an unseaworthy condition which arises only during the progress of the voyage," the shipowner's obligation "is merely to see that reasonable care is used under the circumstances . . . incident to the correction of the newly arisen defect." 265 F. 2d 426, 432. Certiorari was granted, 361 U. S. 808, to consider a question of maritime law upon which the Courts of Appeals have expressed differing views. Compare *Cookingham* v. *United States,* 184 F. 2d 213 (C. A. 3d Cir.), with *Johnson Line* v. *Maloney,* 243 F. 2d 293 (C. A. 9th Cir.), and *Poignant* v. *United States,* 225 F. 2d 595 (C. A. 2d Cir.).

In its present posture this case thus presents the single issue whether with respect to so-called "transitory" unseaworthiness the shipowner's liability is limited by concepts of common-law negligence. There are here no problems, such as have recently engaged the Court's attention, with respect to the petitioner's status as a "seaman." Cf. *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85; *Pope & Talbot, Inc.,* v. *Hawn,* 346 U. S. 406; *United Pilots Assn.* v. *Halecki,* 358 U. S. 613, or as to the status of the vessel itself. Cf. *West* v. *United States,* 361 U. S. 118. The *Racer* was in active maritime operation, and the petitioner was a member of her crew.[4]

---

[4] The trial judge instructed the jury as follows: "In this case, on the basis of rulings I made earlier, I have instructed you on the undisputed fact, Mr. Mitchell is to be regarded as being an employee of the defendant and therefore entitled to those rights if any which flow from the maritime law and flows [*sic*] from the act of Congress."

In a memorandum filed almost a month after the trial, the district judge, apparently relying upon the fact that the shipowner had no direct financial interest in the spawn which had been unloaded

The origin of a seaman's right to recover for injuries caused by an unseaworthy ship is far from clear. The earliest codifications of the law of the sea provided only the equivalent of maintenance and cure—medical treatment and wages to a mariner wounded or falling ill in the service of the ship. Markedly similar provisions granting relief of this nature are to be found in the Laws of Oleron, promulgated about 1150 A. D. by Eleanor, Duchess of Guienne; in the Laws of Wisbuy, published in the following century; in the Laws of the Hanse Towns, which appeared in 1597; and in the Marine Ordinances of Louis XIV, published in 1681.[5]

For many years American courts regarded these ancient codes as establishing the limits of a shipowner's liability to a seaman injured in the service of his vessel. *Harden* v. *Gordon,* 2 Mason 541; *The Brig George,* 1 Sumner 151;

(see note 1, *supra*), stated that, "[T]here should have been a directed verdict for the defendant on the unseaworthiness count. If there were slime on the rail, it was put there by an associate and joint-venturer of the plaintiff and not by a stranger or by anyone acting for the defendant. If Sailor A and his wife go on board, and each of them has a right to be there, but they are engaging in a frolic of their own, not intended for the profit or advantage of the shipowner, say, for example, that they are munching taffy, and the wife drops the taffy on the deck, and the sailor slips on it, the sailor, if he is injured, is not entitled to collect damages from the shipowner. In short, absolute as is the liability for unseaworthiness, it does not subject the shipowner to liability from articles deposited on the ship by a co-adventurer of the plaintiff." But this theory played no part in the issues developed at the trial, where the district judge denied the respondent's motion for a directed verdict and instructed the jury as indicated above.

[5] All of these early maritime codes are reprinted in 30 Fed. Cas. 1171–1216. The relevant provisions are Articles VI and VII, of the Laws of Oleron, 30 Fed. Cas. 1174–1175; Articles XVIII, XIX, and XXXIII, of the Laws of Wisbuy, 30 Fed. Cas. 1191, 1192; Articles XXXIX and XLV of the Laws of the Hanse Towns, 30 Fed. Cas. 1200; and Title Fourth, Articles XI and XII, of the Marine Ordinances of Louis XIV, 30 Fed. Cas. 1209.

544

*Reed* v. *Canfield,* 1 Sumner 195.[6] During this early period the maritime law was concerned with the concept of unseaworthiness only with reference to two situations quite unrelated to the right of a crew member to recover for personal injuries. The earliest mention of unseaworthiness in American judicial opinions appears in cases in which mariners were suing for their wages. They were required to prove the unseaworthiness of the vessel to excuse their desertion or misconduct which otherwise would result in a forfeiture of their right to wages. See *Dixon* v. *The Cyrus,* 7 Fed. Cas. 755, No. 3,930; *Rice* v. *The Polly & Kitty,* 20 Fed. Cas. 666, No. 11,754; *The Moslem,* 17 Fed. Cas. 894, No. 9,875. The other route through which the concept of unseaworthiness found its way into the maritime law was via the rules covering marine insurance and the carriage of goods by sea. *The Caledonia,* 157 U. S. 124; *The Silvia,* 171 U. S. 462; *The Southwark,* 191 U. S. 1; I Parsons on Marine Insurance (1868) 367–400.

Not until the late nineteenth century did there develop in American admiralty courts the doctrine that seamen had a right to recover for personal injuries beyond maintenance and cure. During that period it became generally accepted that a shipowner was liable to a mariner injured in the service of a ship as a consequence of the owner's failure to exercise due diligence. The decisions of that era for the most part treated maritime injury cases on the same footing as cases involving the duty of a shoreside employer to exercise ordinary care to provide his employees with a reasonably safe place to work. *Brown* v. *The D. S. Cage,* 4 Fed. Cas. 367, No. 2002;

---

[6] And, of course, the vitality of a seaman's right to maintenance and cure has not diminished through the years. *Calmar S. S. Corp.* v. *Taylor,* 303 U. S. 525; *Waterman S. S. Corp.* v. *Jones,* 318 U. S. 724; *Farrell* v. *United States,* 336 U. S. 511; *Warren* v. *United States,* 340 U. S. 523.

*Halverson* v. *Nisen,* 11 Fed. Cas. 310, No. 5970; *The Noddleburn,* 28 Fed. 855; *The Neptuno,* 30 Fed. 925; *The Lizzie Frank,* 31 Fed. 477; *The Flowergate,* 31 Fed. 762; *The A. Heaton,* 43 Fed. 592; *The Julia Fowler,* 49 Fed. 277; *The Concord,* 58 Fed. 913; *The France,* 59 Fed. 479; *The Robert C. McQuillen,* 91 Fed. 685.

Although some courts held shipowners liable for injuries caused by "active" negligence, *The Edith Godden,* 23 Fed. 43; *The Frank & Willie,* 45 Fed. 494, it was held in *The City of Alexandria,* 17 Fed. 390, in a thorough opinion by Judge Addison Brown, that the owner was not liable for negligence which did not render the ship or her appliances unseaworthy. A closely related limitation upon the owner's liability was that imposed by the fellow-servant doctrine. *The Sachem,* 42 Fed. 66.[7]

This was the historical background behind Mr. Justice Brown's much quoted second proposition in *The Osceola,* 189 U. S. 158, 175: "That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship." In support of this proposition the Court's opinion noted that "[i]t will be observed in these cases that a departure has been made from the Continental codes in allowing an indemnity beyond the expense of maintenance and cure in cases arising from unseaworthiness. This departure originated in England in the Merchants' Shipping Act of 1876 . . . and in this country, in a general consensus of opinion among the Circuit and

---

[7] For a more thorough discussion of the history here sketched see Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L. Q. 381, 382–403; Gilmore and Black, The Law of Admiralty (1957), pp. 315–332. See also the illuminating discussion in the opinion of then Circuit Judge Harlan in *Dixon* v. *United States,* 219 F. 2d 10, 12–15.

District Courts, that an exception should be made from the general principle before obtaining, in favor of seamen suffering injury through the unseaworthiness of the vessel. We are not disposed to disturb so wholesome a doctrine by any contrary decision of our own." 189 U. S., at 175.

It is arguable that the import of the above-quoted second proposition in *The Osceola* was not to broaden the shipowner's liability, but, rather, to limit liability for negligence to those situations where his negligence resulted in the vessel's unseaworthiness. Support for such a view is to be found not only in the historic context in which *The Osceola* was decided, but in the discussion in the balance of the opinion, in the decision itself (in favor of the shipowner), and in the equation which the Court drew with the law of England, where the Merchant Shipping Act of 1876 imposed upon the owner only the duty to use "all reasonable means" to "insure the seaworthiness of the ship." This limited view of *The Osceola's* pronouncement as to liability for unseaworthiness may be the basis for subsequent decisions of federal courts exonerating shipowners from responsibility for the negligence of their agents because that negligence had not rendered the vessel unseaworthy. *The Henry B. Fiske,* 141 Fed. 188; *Tropical Fruit S. S. Co.* v. *Towle,* 222 Fed. 867; *John A. Roebling's Sons Co.* v. *Erickson,* 261 Fed. 986. Such a reading of the *Osceola* opinion also finds arguable support in several subsequent decisions of this Court. *Baltimore S. S. Co.* v. *Phillips,* 274 U. S. 316; *Plamals* v. *The Pinar Del Rio,* 277 U. S. 151; *Pacific Co.* v. *Peterson,* 278 U. S. 130.[8] In any event, with the passage of the Jones Act in 1920, 41 Stat. 1007, 46 U. S. C. § 688, Congress effectively obliterated all distinctions between

---

[8] Where it was said "[u]nseaworthiness, as is well understood, embraces certain species of negligence; while the [Jones Act] includes several additional species not embraced in that term." 278 U. S., at 138.

the kinds of negligence for which the shipowner is liable, as well as limitations imposed by the fellow-servant doctrine, by extending to seamen the remedies made available to railroad workers under the Federal Employers' Liability Act.[9]

The first reference in this Court to the shipowner's obligation to furnish a seaworthy ship as explicitly unrelated to the standard of ordinary care in a personal injury case appears in *Carlisle Packing Co.* v. *Sandanger,* 259 U. S. 255. There it was said "we think the trial court might have told the jury that without regard to negligence the vessel was unseaworthy when she left the dock . . . and that if thus unseaworthy and one of the crew received damage as the direct result thereof, he was entitled to recover compensatory damages." 259 U. S., at 259. This characterization of unseaworthiness as unrelated to negligence was probably not necessary to the decision in that case, where the respondent's injuries had clearly in fact been caused by failure to exercise ordinary care (putting gasoline in a can labeled "coal oil" and neglecting to provide the vessel with life preservers). Yet there is no reason to suppose that the Court's language was inadvertent.[10]

During the two decades that followed the *Carlisle* decision there came to be a general acceptance of the view that *The Osceola* had enunciated a concept of absolute liability for unseaworthiness unrelated to principles of negligence law. Personal injury litigation based upon unseaworthiness was substantial. See, Gilmore and Black, The Law of Admiralty (1957), p. 316. And the standard texts accepted that theory of liability without question.

[9] An earlier legislative effort to broaden recovery for injured seamen (the La Follette Act of 1915, 38 Stat. 1164, 1185) had been emasculated in *Chelentis* v. *Luckenbach S. S. Co.,* 247 U. S. 372.

[10] As one commentator has chosen to regard it. See Tetreault, *op. cit., supra,* note 7, at 394.

See Benedict, The Law of American Admiralty (6th ed., 1940), Vol. I, § 83; Robinson, Admiralty Law (1939), p. 303 *et seq.* Perhaps the clearest expression appeared in Judge Augustus Hand's opinion in *The H. A. Scandrett,* 87 F. 2d 708:

> "In our opinion the libelant had a right of indemnity for injuries arising from an unseaworthy ship even though there was no means of anticipating trouble.
>
> "The ship is not freed from liability by mere due diligence to render her seaworthy as may be the case under the Harter Act (46 U. S. C. A. §§ 190–195) where loss results from faults in navigation, but under the maritime law there is an absolute obligation to provide a seaworthy vessel and, in default thereof, liability follows for any injuries caused by breach of the obligation." 87 F. 2d, at 711.

In 1944 this Court decided *Mahnich* v. *Southern S. S. Co.,* 321 U. S. 96. While it is possible to take a narrow view of the precise holding in that case,[11] the fact is that *Mahnich* stands as a landmark in the development of admiralty law. Chief Justice Stone's opinion in that case gave an unqualified stamp of solid authority to the view that *The Osceola* was correctly to be understood as holding that the duty to provide a seaworthy ship depends not at all upon the negligence of the shipowner or his agents. Moreover, the dissent in *Mahnich* accepted this reading of *The Osceola* and claimed no more than that the injury in *Mahnich* was not properly attributable to unseaworthiness. See 321 U. S., at 105–113.

In *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85, the Court effectively scotched any doubts that might have lingered

---

[11] *I. e.,* as simply overruling the decision in *Plamals* v. *The Pinar Del Rio,* 277 U. S. 151, that unseaworthiness cannot include "operating negligence." See Gilmore and Black, *op. cit., supra,* at 317.

after *Mahnich* as to the nature of the shipowner's duty to provide a seaworthy vessel. The character of the duty, said the Court, is "absolute." "It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. . . . It is a form of absolute duty owing to all within the range of its humanitarian policy." 328 U. S., at 94–95. The dissenting opinion agreed as to the nature of the shipowner's duty. "[D]ue diligence of the owner," it said, "does not relieve him from this obligation." 328 U. S., at 104.

From that day to this, the decisions of this Court have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care. *Pope & Talbot, Inc.,* v. *Hawn,* 346 U. S. 406; *Alaska Steamship Co.* v. *Petterson,* 347 U. S. 396; *Rogers* v. *United States Lines,* 347 U. S. 984; *Boudoin* v. *Lykes Bros. S. S. Co.,* 348 U. S. 336; *Crumady* v. *The J. H. Fisser,* 358 U. S. 423; *United Pilots Assn.* v. *Halecki,* 358 U. S. 613.

There is no suggestion in any of the decisions that the duty is less onerous with respect to an unseaworthy condition arising after the vessel leaves her home port, or that the duty is any less with respect to an unseaworthy condition which may be only temporary. Of particular relevance here is *Alaska Steamship Co.* v. *Petterson, supra.* In that case the Court affirmed a judgment holding the shipowner liable for injuries caused by defective equipment temporarily brought on board by an independent contractor over which the owner had no control. That decision is thus specific authority for the proposition that the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability.

That decision also effectively disposes of the suggestion that liability for a temporary unseaworthy condition is different from the liability that attaches when the condition is permanent.[12]

There is ample room for argument, in the light of history, as to how the law of unseaworthiness should have or could have developed. Such theories might be made to fill a volume of logic. But, in view of the decisions in this Court over the last 15 years, we can find no room for argument as to what the law is. What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence. To hold otherwise now would be to erase more than just a page of history.

What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. *Boudoin* v. *Lykes Bros. S. S. Co.*, 348 U. S. 336.

The judgment must be reversed, and the case remanded to the District Court for a new trial on the issue of unseaworthiness.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER join, dissenting.

No area of federal law is judge-made at its source to such an extent as is the law of admiralty. The evolution of judge-made law is a process of accretion and erosion. We are told by a great master that law is civilized to the

---

[12] The persuasive authority of *Petterson* in a case very similar to this one has been recognized by the Court of Appeals for the Second Circuit. *Poignant* v. *United States*, 225 F. 2d 595.

extent that it is purposefully conscious. Conversely, if law just "grow'd" like Topsy, unreflectively and without conscious design, it is irrational. When it appears that a challenged doctrine has been uncritically accepted as a matter of course by the inertia of repetition—has just "grow'd" like Topsy—the Court owes it to the demands of reason, on which judicial law-making power ultimately rests for its authority, to examine its foundations and validity in order appropriately to assess claims for its extension.

Our law of the sea has an ancient history. While it has not been static, the needs and interests of the interrelated world-wide seaborne trade which it reflects are very deeply rooted in the past. For the most part it has not undergone the great changes attributable to the emergence and growth of industrialized society on land. In the law of the sea, the continuity and persistence of a doctrine, particularly one with international title-deeds, has special significance.

The birth of the current doctrine of unseaworthiness, now impressively challenged by Chief Judge Magruder's opinion under review, can be stated precisely: it occurred on May 29, 1922, in *Carlisle Packing Co. v. Sandanger*, 259 U. S. 255. The action was brought in the Washington state courts by Sandanger, an employee of Carlisle, who was injured while working on its motorboat on a six- or eight-hour trip. The injury occurred when he lighted fuel from a can on board marked "coal oil" in order to start a cookstove, and it exploded. It appeared thereafter that the can had mistakenly been filled with gasoline. In a suit based on a claim of negligence, Sandanger won a verdict on a finding of negligence, which was challenged in the Supreme Court of Washington on the ground that the exclusively applicable maritime law did not afford relief by way of compensation for negligent injury of an employee. The Washington court held that an

injury caused by a negligently created unseaworthy condition was compensable, even when, under the rule laid down in *The Osceola,* 189 U. S. 158, negligent injury without unseaworthiness would not be. 112 Wash. 480, 192 P. 1005.

The matter was dealt with in this Court in the few lines innovating the rule of absolute liability: "we think the trial court might have told the jury that without regard to negligence the vessel was unseaworthy when she left the dock . . . and that if . . . one of the crew received damage as the direct result thereof, he was entitled to recover compensatory damages." 259 U. S., at 259. (The full text is quoted in the margin.[1]) No explication accompanied this dogmatic pronouncement on an issue not presented by an issue of the affirmed judgment. It was strangely deemed sufficient to rely on the unelaborated citation of two cases in this Court (*The Silvia,* 171 U. S. 462, 464, and *The Southwark,* 191 U. S. 1, 8) which were concerned not with the rights of seamen but with the shipowner's liability for cargo damage. The abrupt, unreasoned conclusion was reached without benefit of argument: the parties had presented the case solely on the basis on which the action was instituted and in the terms in which it had been decided by the Supreme Court of Washington—liability founded on negligence. Neither our own investigation nor that of the parties here has disclosed a single case in an English or an American court prior to *Sandanger* in which the absolute duty to

---

[1] "Considering the custom prevailing in those waters and other clearly established facts, in the present cause, we think the trial court might have told the jury that without regard to negligence the vessel was unseaworthy when she left the dock if the can marked 'coal oil' contained gasoline; also that she was unseaworthy if no life preservers were then on board; and that if thus unseaworthy and one of the crew received damage as the direct result thereof, he was entitled to recover compensatory damages."

provide a seaworthy vessel for cargo carriage and marine insurance contracts was applied to a seaman's suit for personal injury. *Sandanger* was an unillumined departure in the law of the sea. Reasoned decision of the case before us, in which extension is sought of a rule so dubiously initiated,[2] requires that its rational, historical and social basis be scrutinized and not merely accepted as unquestionable dogma.

We must take it as established that the petitioner, a seaman employed on the *Racer,* fell from her rail while using it as a customary stepping place in leaving the vessel; that the resulting injury was caused by the presence of fish spawn on the rail rendering it slippery; that it was not negligent for respondent to allow the spawn to get on and remain on the rail.[3] It further appears that the spawn was deposited on the rail shortly before the injury, when bags of it were handed across the rail in the course of the unloading of the vessel.

The claim now before the Court rested on the alleged unseaworthiness of the vessel. Petitioner asserts that if the presence of spawn on the rail rendered it not reasonably fit for its function, then, without more—and particularly without regard to the length of time the spawn had remained on the rail—respondent was liable to compensate him for his consequent injuries. He asserts that these conclusions flow from the rule of *Sandanger, supra,* that the owner's liability to compensate

---

[2] Chief Judge Magruder has appropriately noted that no previous decision in this Court has considered whether liability for unseaworthiness existing at the start of the voyage extends to subsequently arising conditions. 265 F. 2d, at 432; see also *Dixon* v. *United States,* 219 F. 2d 10 (C. A. 2d Cir.).

[3] It was not contended that the failure to provide the vessel with a different mode of access, or other means for unloading, rendered it unseaworthy from the start of the voyage. Cf. *Poignant* v. *United States,* 225 F. 2d 595 (C. A. 2d Cir.).

seamen for injuries caused by the unseaworthiness of his vessel is "absolute."

Respondent contends, and the lower courts held, that the fact that spawn on the rail caused petitioner's injury is not, of itself, sufficient to establish respondent's liability. It urges two related propositions in the alternative in support of its judgment. The first of these—the express ground of Judge Magruder's decision and the primary ground urged here in its support—is that since this unseaworthy condition concededly did not arise until after the commencement of the voyage it did not create liability unless it persisted so long before the injury as to have afforded the owner notice of its existence. This view makes liability for an unseaworthy condition created without negligence after the start of the voyage turn on the existence of negligence in permitting the condition to persist. Respondent also urges that, even if negligently caused or allowed to persist, this transitory hazard arising after the start of the voyage in equipment otherwise sound was not an unseaworthy condition.

We are thus confronted with two questions of the nature and scope of the duty of a shipowner to seamen to provide a seaworthy ship. The decision in *Sandanger, supra,* in light of the facts from which its generalization was drawn, certainly did not foreshadow the result urged by petitioner, a result characterized by Judge Magruder as "startlingly opposed to principle." 265 F. 2d, at 432. There was in that case no such analysis of the reasons upon which the rule announced was rested as to govern or even suggest the present decision. The Court does not deny force to the distinctions urged by respondent, but regards the questions now presented as foreclosed by *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396. In fact, today's decision rests on an unrevealing *per curiam* opinion, itself founded on prior decisions affording no justification for the result here.

As the opinion of the Court of Appeals shows, 205 F. 2d 478, that case held a shipowner liable for injuries to a longshoreman caused by defective equipment brought on board his vessel by a contract stevedore for use in loading operations. The owner gave the stevedore permission at his option to substitute his own equipment for that of the vessel, and the equipment which caused the injury was a snatch-block, standard ships' equipment, supplied pursuant to that permission. Following *Seas Shipping Co. v. Sieracki*, 328 U. S. 85, and *Pope & Talbot v. Hawn*, 346 U. S. 406, which had held that the owner's duty to provide a seaworthy ship runs to non-seamen engaged in seamen's work, *Petterson* at best added to this doctrine the rule that that duty could not be delegated by giving the stevedore control over loading operations and an option to substitute its own equipment for that of the vessel. The parties did not raise or argue either (1) that the vessel was seaworthy at the start of her voyage and no absolute liability attached to subsequently arising conditions, or (2) that because the condition was temporary, in the sense pertinent here, there was no unseaworthiness. There is therefore no foundation, either in what the *per curiam* revealed or in the history of the case, to warrant the inference that the Court was conscious of the distinctions now squarely pressed upon us, much less that it rejected them. Such a conclusion is the more fanciful because, even had the Court considered and accepted the contentions now urged, it might well have found them insufficient to avoid liability and have held that, by giving permission to have substitution made for warranted ships' equipment, the owner adopted the substitute as his own.

In view of the insubstantial foundation in authority of what is today decided, I deem it incumbent upon me to examine the history of the evolution of the doctrine of

absolute liability in injury cases upon which petitioner rests his claim.

Although it was reasonably well established by the middle of the nineteenth century that the maritime carrier of goods, in the absence of express provisions to the contrary, warranted their safe delivery against all hazards save acts of God or the public enemy, see, *e. g., The Propeller Niagara* v. *Cordes,* 21 How. 7, 23, the origins of such strict liability are not entirely clear. The English admiralty courts apparently confined the shipowner's liability to losses resulting from his fault or that of his servants. See Fletcher, The Carrier's Liability, 51–79. The imposition of stricter liability appears to have begun not in the admiralty at all, but in the common-law courts as the jurisdiction of the admiral gradually declined. See Mears, The History of the Admiralty Jurisdiction, in 2 Select Essays in Anglo-American Legal History, p. 312 *et seq.* (originally published in Roscoe, Admiralty Jurisdiction and Practice, pp. 1–61). They increasingly regarded the carrier by sea as a common carrier, whether or not he fitted the traditional concept, see Paton, Bailment in the Common Law, 233–236, and it does not appear that they predicated his strict liability to redeliver cargo on any peculiarly maritime aspects of the carriage.

In any event, with the sanction of the English—and, to a lesser extent, the American—courts it early became possible for the maritime carrier to use the contract of carriage by way of limiting this extraordinary liability, and the significance of a carrier's liability as such shrank. See *Pope* v. *Nickerson,* 3 Story 465. Disclaimers of any duty beyond the exercise of diligence were valid and common, and, in England, disclaimers of liability even for negligent damage were sustained. See I Parsons, Maritime Law, 177–179, n. 1; compare, *In re Missouri S. S. Co.,* 42 Ch. D. 321 (1889), with *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 438–439 (1889).

It was against the background of such limitations of the carrier's strict duty to redeliver cargo, and in derogation of them, that the more limited, though absolute, duty to furnish a seaworthy vessel emerged. Unlike the strict duty imposed on carriers in general to redeliver cargo, it was a concept rooted in the peculiarly maritime hazards of carriage by sea. It expressed, and became the focus of, American judicial resistance to broad disclaimers, and was implied despite relatively specific limitations in the contract of carriage. See, *e. g.*, *The Caledonia,* 157 U. S. 124, 137. The reasons for the development are evident. The hazards of the sea were great even in vessels properly maintained and outfitted; in imperfect ships they became intolerable. Since at the start of a voyage the familiar facilities of the home port were ordinarily available to the owner to permit him to reduce the risk, it was not unreasonable to require him at the peril of extensive liability to make the vessel seaworthy—reasonably fit for the intended voyage, see *The Silvia,* 171 U. S. 462, 464; *The Southwark,* 191 U. S. 1, 9—and thereby remove a profitable temptation to add to the hazards of the sea. Though the fact that the duty was absolute is in some measure indicative of an unstated determination that the carrier's ability to distribute the risk justified regarding him as an insurer, cf. *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85, 94, the dominant reason appears to have been that under the conditions existing before the start of a voyage it was fair to demand the increment of additional safety which could be obtained by barring the defense of due care. The instances of defects in fact undiscoverable under the comparatively ideal pre-voyage circumstances would be predictably low, and the extraordinary character of the risk, coupled with the exclusive knowledge and control of the owner and his ability to contract away the risk in his

dealings with suppliers and service companies, justified imposing the burden on him.

This judicial evolution was doubtless influenced as well by the similarly absolute implied warranty in contracts of marine insurance by which the assured, whether shipowner, charterer, or shipper, warranted the seaworthiness of the vessel at the start of its voyage as a condition upon the attaching of the policy. The origin of this rule has been attributed to the customary understanding of the risks actually undertaken by the insurer. See, *e. g.*, Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L. Q. 381, 395. But whatever role custom may have played, the implied warranty appears to have sprung, at least in part, from considerations of policy unrelated to the insurer's understanding. "I have endeavoured, both with a view to the benefit of commerce and the preservation of human life, to enforce that doctrine [of the implied warranty of initial seaworthiness] as far as, in the exercise of a sound discretion, I have been enabled to do so. . . ." Lord Eldon, in *Douglas* v. *Scougall,* 4 Dow 269, 276 [1816]; cf. *The Caledonia,* 157 U. S. 124.

Toward the end of the nineteenth century these different considerations, which had given rise to a single duty, became imperceptibly fused. This Court held that the warranty of assured to insurer was identical to that of carrier to shipper, even explaining the carrier's implied promise in terms of the undertaking of the shipper. *The Caledonia,* 157 U. S. 124.

The divergence of attitude between American and English courts which appeared in the scope of the contractual disclaimers of liability each would recognize, was more sharply exemplified by the scope they respectively attributed to the warranty of seaworthiness in cargo and insurance cases. By 1853 English courts had clearly limited the warranty to the condition of the vessel at the

start of the voyage, while recognizing that American courts had just as clearly held the owner liable and the insurer exonerated for losses occasioned by unseaworthy conditions subsequently arising and allowed to persist through the negligence of responsible servants. See, *e. g.,* Baron Parke in *Gibson* v. *Small,* 4 H. L. Cas. 353, 398–399; I Parsons, Marine Insurance, 381–383; *Union Ins. Co.* v. *Smith,* 124 U. S. 405, 427. The English courts were strongly influenced by the inherent limitations of the owner's actual control of a vessel (see, *e. g., Gibson* v. *Small, supra,* at 404); while the American so highly esteemed the protection of life and property, presumably to be so gained, as to have held the owner in effect absolutely liable to select master and crew who would in fact diligently see to the continuing seaworthiness of the vessel. In America, the result of the conflicts created by this divergence in the law of two maritime nations was the Harter Act of 1893, 27 Stat. 445. The carrier was thereby permitted to disclaim any duty other than to exercise due diligence in the preparation of the vessel. If he in fact exercised such diligence, he was freed of liability for losses "resulting from faults or errors in navigation or in the management" of the vessel. The purpose and effect of the Act was to strike a compromise between the English and American standards so as to reduce conflicts between them.[4] See Gilmore and Black, The Law of Admiralty, 122. One collateral effect of the Act was largely to remove from concern of the

---

[4] The considerations urging harmony of law for international carriage, especially as between the United States and the United Kingdom, led, in 1936, to the enactment of the Carriage of Goods by Sea Act, 49 Stat. 1207, substantially adopting the recommendations of an international convention on the problem. See Gilmore and Black, The Law of Admiralty, 122–124. Where applicable, the 1936 Act imposes only the duty to use due diligence to provide a seaworthy ship at the start of the voyage.

courts questions of liability for cargo damage caused by unseaworthy conditions arising after the start of the voyage. Cf. *The Silvia,* 171 U. S. 462; *May* v. *Hamburg-Amerikanische,* 290 U. S. 333. After, and probably because of, the Harter Act, the statement frequently appears in cargo-damage cases that the warranty of seaworthiness applies only at the start of the voyage; subsequently arising deficiencies are treated as aspects of "navigation or management." See, *e. g., May* v. *Hamburg-Amerikanische, supra,* at 345; *The Steel Navigator,* 23 F. 2d 590, 591 (C. A. 2d Cir. 1928). However, even that Act did not diminish the tendency of the admiralty courts to find that a contractual disclaimer did not apply to the warranty of seaworthiness at the start of the voyage, and the absolute warranty of initial seaworthiness therefore remained. See, *e. g., The Carib Prince,* 170 U. S. 655.

The most striking differences between English and American courts as to the scope of the warranty of seaworthiness occurred in the area of compensation for seamen's injuries.[5] The law of both nations early recognized unseaworthiness as a condition upon the contract of employment, which, upon the employer's default, operated to exonerate the seaman from forfeiture of wages if he quit the ship. 1 Parsons, Maritime Law, 455; *The Arizona* v. *Anelich,* 298 U. S. 110, 121–122, n. 2. But

---

[5] From the time of the earliest maritime codes seamen injured in the service of the vessel have, to varying extents, been entitled to maintenance and cure at the expense of the ship. See *The Osceola,* 189 U. S. 158, 169–170. But the seaman's right to compensation for injuries is a relatively modern development, probably originating in cases concerning the negligent failure of the vessel to discharge the duty to provide maintenance and cure. See *Brown* v. *Overton,* 4 Fed. Cas. 418 (D. C. Mass. 1859); Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L. Q. 381, 385. However, there appears to have been no connection between the elaboration of the duty to provide maintenance and cure and the emergence of the doctrine of absolute liability for unseaworthiness.

though the duty to provide a seaworthy vessel was thus held to run to seamen, the seaman's remedy was for a considerable time restricted to this limited form of self-help.

In England the question of a seaman's right to compensatory damages for injuries resulting from the unseaworthiness of the vessel was first presented for decision in *Couch* v. *Steele,* [1854] 3 El. & Bl. 402. The plaintiff claimed compensation for damage from illness brought about by the leaky condition of the vessel. The court, apparently assuming that the vessel was unseaworthy, declared that the warranty did not run to seamen, for the reason that it was unknown whether the deficiencies of the vessel were taken into account in the contract for wages. Coleridge, J. (at 408), distinguished the insurance warranty as turning on doctrines which "have no place in any other branch of the law," and confined the duty of owner to seamen to the scope of master-servant law on land. A similar disposition to analogize maritime to non-maritime activity on the part of the English common-law courts was manifested in *Readhead* v. *Midland R. Co.,* [1869] L. R., 4 Q. B. 379, where the claim was advanced that a railway passenger injured when a wheel broke was, by analogy to the warranty of seaworthiness as to cargo, entitled to compensation for his injuries. The court disposed of the contention by describing the warranty of seaworthiness as solely responsive to the need, early noted in *Coggs* v. *Bernard,* [1703] 2 Ld. Raym. 909, to prevent common carriers generally from colluding with thieves.

*Couch* v. *Steele, supra,* was modified by the Merchant Shipping Act of 1876, 39 & 40 Vict., c. 80, sec. 5, by which a duty was imposed on the owner to exercise due care to provide and maintain a seaworthy vessel. For injuries resulting from breach of the duty, a seaman could recover compensatory damages. But even that Act was narrowly

construed as to conditions arising after the start of the voyage in the course of operation of the vessel. See *Hedley* v. *Pinkney & Sons S. S. Co.,* [1894] A. C. 222. In the United States, *Couch* v. *Steele, supra,* was early disapproved. See, *e. g., The Noddleburn,* 28 F. 855 (D. C. Ore. 1886); 2 Parsons, Shipping and Admiralty, 78. The liability which lower courts generally found to exist, however, was not founded upon the absolute warranty rejected in *Couch,* but upon fault. See, *e. g., The Noddleburn, supra; The Flowergate,* 31 F. 762 (D. C. E. D. N. Y. 1887); *The Lizzie Frank,* 31 F. 477, 479 (D. C. S. D. Ala. 1887) (which followed *Readhead* v. *Midland R. Co., supra,* in explaining the cargo warranty as stemming only from common-carrier status).

In 1903 this Court decided *The Osceola,* 189 U. S. 158, and laid down its oft-cited four propositions (at 175) governing the liability of vessel and owner to injured seamen. As has frequently been noted, the second proposition, a dictum declaring a right to indemnity for injuries "received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship" (at 175) does not appear to have announced a doctrine of liability without fault. No cargo or insurance cases were relied upon, and none of the cases cited had found such liability. The only reliance on English law was on the Act of 1876, *supra,* which defined the duty as requiring the exercise of due diligence to render the vessel seaworthy. It appears instead that it was the intention of *The Osceola* to adopt the analysis of Judge Addison Brown in *The City of Alexandria,* 17 F. 390 (D. C. S. D. N. Y. 1883), which it cited, under which a seaman could recover only for injuries resulting from that limited species of negligence which resulted in an unseaworthy condition. Such is the tenor of the third and fourth propositions of *The Osceola.*

After *The Osceola* a number of decisions denied recovery for negligently caused injury on the ground that unseaworthiness was absent. See, *e. g., Tropical Fruit S. S. Co.* v. *Towle,* 222 F. 867 (C. A. 5th Cir. 1915); *John A. Roebling's Sons Co.* v. *Erickson,* 261 F. 986 (C. A. 2d Cir. 1919). After an abortive attempt by Congress, see 38 Stat. 1164, 1185; *Chelentis* v. *Luckenbach S. S. Co.,* 247 U. S. 372, there followed in 1920 the remedial legislation now familiarly known as the Jones Act, extending relief against the owner for all forms of negligent injury to seamen, free of the so-called fellow-servant rule of admiralty.

It was against this background that *Carlisle Packing Co.* v. *Sandanger,* 259 U. S. 255, quite out of the blue, citing cargo cases, declared that the owner's duty to a seaman to provide a seaworthy vessel was as absolute as that established by the implied warranty as to cargo.[6] In so ruling, the Court gave expression to a policy, long discernible in American admiralty decisions, of implying the warranty not merely because of the customary expectations of the parties to an agreement—the English court's basis for rejection of the warranty in *Couch* v. *Steele, supra*—but as well in order to increase protection to life and property against the hazards of the sea. They had previously manifested this conception of the source of the warranty in the degree to which they departed from the English common-law courts in confining attempted disclaimers of the warranty, and in their willingness to find a duty to maintain the condition of seaworthiness throughout the voyage.

The reasons which justified the implication on grounds of policy as to cargo, justified it as to employed seamen;

---

[6] It is not irrelevant to note that the spokesman for the Court was the Justice under whose lead the most unhappy admiralty doctrines were promulgated: *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, and *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149.

and there was no countervailing extensive increase in the nature of the duty to give the Court serious pause in extending to the protection of life a policy designed in significant part for the protection of property. Despite the Harter Act, the absolute warranty of initial seaworthiness as to cargo survived; and under the strict rules of shipboard organization and conduct, the safety of the seaman was, in a very real sense, subject to the same hazards.

It was predictable that there would be few, if any, matters with which the owner would have to be concerned under the warranty so extended, that he could reasonably have ignored as creating no threat to the safety of cargo. At the start of the voyage, his opportunity would be ample, as in the case of cargo, to undertake that effective diligence which would in fact avoid all but a very few injuries resulting from unseaworthiness; and he would be able to protect himself from the consequences of most deficiencies undetectable by him by agreement with suppliers, or service companies, and from the rest by the purchase of insurance. The additional burden created by extension of the warranty to seamen was thus not unduly heavy; and the interest to be vindicated had for long been a traditional concern of American admiralty.

If *Sandanger* now stood alone, it would be plain that the absolute warranty it announced was no greater in scope than the warranty as to cargo which pre-existed the Harter Act of 1893, and the question now presented—whether the warranty is also absolute as to subsequently arising conditions—would clearly present a novel issue for decision. Subsequent decisions in this Court have not deliberately closed the gap.

It was twenty-two years before the question of the existence and scope of absolute liability came before

this Court again, and in the interim the lower courts manifested sharp disagreement whether it existed at all. Compare *The Rolph,* 299 F. 52 (C. A. 9th Cir. 1924), and *The Tawmie,* 80 F. 2d 792 (C. A. 5th Cir. 1936), with *The H. A. Scandrett,* 87 F. 2d 708 (C. A. 2d Cir. 1937). (In this case Judge Augustus N. Hand followed *Sandanger* in relying upon cargo cases.)

In 1944 this Court decided *Mahnich* v. *Southern S. S. Co.,* 321 U. S. 96. The suit was brought by a seaman under the general maritime law (the statute of limitations having run on Jones Act claims) for injuries which he incurred at sea when a rope, with which the staging on which he was working fifteen feet over the deck was rigged, parted and he fell. The mate in charge had taken the rope, which was unused, but at least two years old, from the Lyle Gun (a life-saving device) box. After the accident it appeared that the rope was decayed.

The District Court, 45 F. Supp. 839, found that the mate's selection of the rope was negligent but dismissed the libel on the ground that, apart from the Jones Act, negligent injury alone was not compensable and that the vessel, since it had other good rope on board sufficient for the job, was not unseaworthy. The Court of Appeals affirmed. 135 F. 2d 602. It assumed, without deciding, that the rope was negligently selected (a dissenting judge found no negligence, 135 F. 2d, at 605), and agreed with the District Court's conclusion that the vessel was not unseaworthy. Though it reversed, this Court, too, found it unnecessary to decide the contested question of negligence. It gave as its primary reason that "the exercise of due diligence does not relieve the owner of his obligation to the seaman to furnish adequate appliances." (321 U. S., at 100.) Although this statement was the critical major premise of an opinion which went on to decide that such absolute liability would not be barred by

the mate's intervening negligence, it was rested primarily on *Carlisle Packing Co.* v. *Sandanger, supra,* without further explanation.

There is no more disclosure in the opinion or history of this case than there was in *Sandanger* to warrant attributing to this statement a deliberate or authoritative ruling that liability is absolute for all injuries resulting from unseaworthy conditions. Confined to the facts of the case, the decision that intervening negligence would not constitute a defense to an action for injuries resulting from an unseaworthy condition is consistent with the rule of the cargo and insurance cases, confining the absolute warranty to damage resulting from initial unseaworthiness. The rope, which was new, had decayed from overlong or improper storage, not from use, and was, it is right to assume, defective from the start of the voyage. Cf. *The Edwin I. Morrison,* 153 U. S. 199, 211.

Moreover, a claim for extending the scope of the absolute warranty was not raised or argued by the parties. They simply assumed that liability would follow unseaworthiness unless intervening negligence was a defense. Their major concern, and the primary focus of the Court's attention, was the earlier case of *Plamals* v. *The Pinar Del Rio,* 277 U. S. 151, where it was held, on substantially identical facts, that the mate's negligence did not create liability for unseaworthiness where there was an adequate supply of sound rope on board. In *Mahnich, Plamals* was held to have rested on one of two mistaken premises: either (1) that the question of seaworthiness turned solely on the supply of rope and not on the condition of the appliance rigged in the course of the voyage, or (2) that liability for provision of an unseaworthy appliance in the course of a voyage would be barred where the unseaworthiness resulted from the mate's negligence. The Court in *Mahnich* was not remotely called upon, in rejecting those premises as it did, to consider whether the absolute war-

ranty of seaworthiness extends to conditions arising after the commencement of the voyage. Finally, there is evidence that if the Court made any assumption about the scope of the warranty it assumed that, as in the case of cargo until the Harter Act, it was absolute, but only as to conditions existing at the commencement of the voyage. It said:

> "It required the Harter Act to relax the exacting obligation to cargo of the owner's warranty of seaworthiness of ship and tackle. That relaxation has not been extended, either by statute or by decision, to the like obligation of the owner to the seaman" (at 101).

*Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85, is no better authority for petitioner's contentions here. The action was instituted by a longshoreman who was injured while loading respondent's vessel, when a forged shackle supporting the vessel's ten-ton boom gave way because of a latent defect in the forging. The defect had existed from the time of the construction of the ship. Both parties conceded that the vessel was unseaworthy, and that if a seaman had been injured in the same way he could have recovered compensatory damages. The District Court gave judgment for the owner on the ground that it was not negligent for it to have failed to discover the defect. 57 F. Supp. 724. The Court of Appeals reversed, on the ground that Sieracki was entitled to recover under the warranty of seaworthiness. 149 F. 2d 98. The turning-point of the case in this Court was whether the warranty of seaworthiness, concededly absolute on the facts, covered longshoremen doing seamen's work.

The Court's extended discussion of the sources and rationale of the warranty is entirely consistent with the history noted above. 328 U. S., at 90–96. Nothing that

was said or implied casts any light whatever on the question whether the initial absolute warranty carried over by *Sandanger* from the cargo cases extends to subsequently arising conditions, unless, as in *Mahnich,* the Court's equation of the warranty running to seamen with the pre-Harter Act warranty as to cargo bespeaks its assumption that the warranty was absolute only as to the start of the voyage.

No other case in this Court is further enlightening on the question of the scope of the absolute warranty. *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396, has already been discussed. See also *Rogers* v. *United States Lines,* 347 U. S. 984. *Pope & Talbot, Inc.,* v. *Hawn,* 346 U. S. 406, is irrelevant here. The injury occurred in port in the course of loading the vessel; the question of unseaworthiness was not an issue in this Court; and the jury had found the defendant guilty of negligence. *Boudoin* v. *Lykes Bros. S. S. Co.,* 348 U. S. 336, concerned unseaworthiness predicated upon the incompetency of a crew member, which, as the Court found, was a traditional aspect of the initial warranty of seaworthiness. *Crumady* v. *The J. H. Fisser,* 358 U. S. 423, found unseaworthiness as a result of the vessel's failure to use "safe practice," 358 U. S., at 426, n., in the preparation of a winch for unloading operations, on its face a negligent act, although its negligent character was not the overt basis of the decision. None of the several parties to the case raised the objections now urged upon us, and no more than in *Mahnich* were they considered or adjudicated.

Against this background of prior adjudications it assumes what is required to be established to assert that "[t]here is no suggestion in any of the decisions that the duty is less onerous with respect to an unseaworthy condition arising after the vessel leaves her home port. . . ." In fact, there is no overt suggestion in any of our decisions that the duty is not less onerous, and the origin

of the duty in cargo and marine insurance cases strongly suggests that it is. Even the admiralty courts of the nineteenth century, during the growth of American shipping, found no justification in peculiarly maritime concerns for imposing an absolute duty at all times after the start of the voyage to maintain the vessel in seaworthy condition. Once the vessel was made safe, it was thought sufficient to entrust its safe conduct to an appropriate standard of diligence. This view undoubtedly involved the weighing of a number of factors, all of which remain pertinent today: the unavailability of the familiar facilities of the home port, or of any port, to make inspections or repairs; the unfairness of holding the vessel accountable for losses resulting from damage, detectable or otherwise, caused, without fault of the vessel, by perils of the sea; the likelihood that those whose safety depends on the vessel will in any event use every reasonable precaution to preserve it, and that in the circumstances of operation of the vessel no additional care could be exacted by the imposition of absolute liability; and the determination that to impose absolute liability for injuries caused by defects arising without fault in the complex operation of a vessel would be, in all the circumstances, unduly burdensome.

This latter consideration is especially pertinent in cases of so-called "transitory" unseaworthiness such as is before us. For disposition of this case it may be assumed, though with considerable misgiving, that the condition here created wholly without fault after the journey had begun, rendered the vessel unseaworthy. But the unreasonableness of imposing liability on the vessel for injuries occasioned by the unavoidable consequences of its proper operation need not therefore be ignored. No compensating increase in the caution actually to be exercised can be anticipated as a result of the creation of such a duty. Nor can the owner pass along the risk to suppliers or

service companies. The only rational justification for its imposition is that the owner is now to be regarded as an insurer who must bear the cost of the insurance. But the Court offers no reason of history or policy why vessel owners, unlike all other employers, should, in circumstances where the only benefit to be gained is the insurance itself, be regarded by law as the insurers of their employees. If there were a sufficient reason for the judicial imposition of such a duty, it would be arbitrary in the extreme to limit it to cases where by chance the injury occurs through the momentary inadequacy of a prudently run vessel. All accidental injury should fall within such a humanitarian policy provided only that it occurs in the service of the ship. It was such a policy which from the earliest times has justified the imposition of the duty to provide maintenance and cure; but nothing in the nature of modern maritime undertakings justifies extending to compensation a form of relief which for more than five centuries has been found sufficient.

I would affirm the judgment below.

Mr. Justice Harlan, whom Mr. Justice Frankfurter and Mr. Justice Whittaker join, dissenting.

In joining my Brother Frankfurter's dissent, I wish to add a few words. I believe the Court's decision not only finds no support in the past cases, but also is unjustified in principle, and is directed at ends not appropriately within our domain. The Second Circuit's decision in *Poignant* v. *United States,* 225 F. 2d 595, provides a useful point of departure for what I have to say.

In *Poignant* the libellant, a crew member, slipped on a small piece of garbage lying in a passageway of the ship. The vessel lacked garbage chutes, and the garbage was pulled, in cans, through the passageway to a railing, where it was jettisoned. The Court of Appeals first expressed the view that any unseaworthy condition which existed

had in all probability arisen after the voyage had commenced. It said, much as the Court now holds, that *Alaska Steamship Co.* v. *Petterson,* 347 U. S. 396, required it to apply a rule of absolute liability nonetheless. It then put, as the critical issue, the question whether the presence of some garbage in a public passageway constituted an unseaworthy condition, and, finding the matter to turn on an issue of fact, remanded the case for trial. However, it is important to note the manner in which the court dealt with the problem. Although at the outset of the opinion the allegedly unseaworthy condition was assumed to be the presence of garbage in a passageway, 225 F. 2d, at 597, the remand was *in fact* directed to the question whether the absence of garbage chutes rendered the vessel not reasonably fit for the voyage, and therefore unseaworthy. *Id.,* at 598. This, of course, would be a condition going to the proper outfitting of the vessel for sea travel, and a clear case of initial unseaworthiness. In such event, the injury would have been the proximate result of that unseaworthiness, for it was by reason of the lack of chutes that garbage was carried through the passageways at all.

For me this approach indicates the rule which should govern the case before us. Had the petitioner contended and proved that a properly outfitted trawler of this type should have had a particular device for unloading fish, or an alternative means of facilitating petitioner's egress from the vessel, so that either the railing would not have been slippery or the petitioner would not have been required to use the railing in debarking, the case would have been governed by the absolute liability rule of *Sandanger* and its successors, and respondent's opportunity to remove the spawn from the rail would properly be held immaterial. As the case is decided, however, we are told that even though there is no claim that the vessel should have made different provisions for the unloading of its

catch or the debarking of its crew, the shipowner is liable for an injury caused by a temporary unsafe condition arising from the normal operation of the vessel, not the result of fault or mismanagement of anyone on board, and which no one had a reasonable opportunity to remedy. Had there been negligence, either in permitting the spawn to accumulate or in failing to remove it, the admiralty principles developed in the cargo cases, and taken over into personal injury cases, would warrant an imposition of liability, although as to cargo damage the Harter Act and the Carriage of Goods by Sea Act would, of course, bar recovery. *The Silvia,* 171 U. S. 462. But where, as here, there is neither a claim that the vessel was initially unseaworthy, nor any showing of negligence, the imposition of liability seems to me, borrowing from Judge Magruder, a "hard doctrine," "startlingly opposed to principle." 265 F. 2d, at 432.

The Court is not fashioning a rule designed to protect life, cf. *Bullard* v. *Roger Williams Ins. Co.,* 4 Fed. Cas. 643, No. 2,122, at 646, for there appears no real basis for expectation that today's decision will promote the taking of greater precautions at sea. See, dissenting opinion of FRANKFURTER, J., *ante,* p. 557. The respondent is held liable, without being told that there was something left undone which should have been done, for petitioner is not asked to show, as was the libellant in *Poignant,* that the vessel ought to have been outfitted differently, that is, in a fashion which would have prevented the dangerous condition from arising at all. Nor is the respondent permitted to show that such condition was not due to its fault.

The *sole* interest served by the Court's decision is compensation. Such an interest is, of course, equally present in the case of an undoubted accident, where under the Court's ruling no right of recovery is bestowed, as it is in the present case. But, because of the Court's inherent

incapacity to deal with the problem in the comprehensive and integrated manner which would doubtless characterize its legislative treatment, cf. *Dixon* v. *United States,* 219 F. 2d 10, 15, this arbitrary limitation is preserved. This internal contradiction in the rule which the Court has established only serves to highlight a more central point: it is not for a court, even a court of admiralty, to fashion a tort rule solely in response to considerations which underlie workmen's compensation legislation, weighty as such considerations doubtless are as a legislative matter. Citation is not needed to remind one of the readiness of Congress to deal with felt deficiencies in judicial protection of the interests of those who go to sea. We should heed the limitations on our own capacity and authority. See *Halcyon Lines* v. *Haenn Ship Corp.,* 342 U. S. 282, 285–287.

I would affirm.