Joseph **ALEXANDER**, Libelant,

v.

**MEIJI KAIUN K. K.**, Respondent,

v.

**Strachan Shipping Company, Respondent-Impleaded.**

No. 4160.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 14, 1961.

August J. Bubert, John P. Nelson, Jr., Leonard S. Ungar, New Orleans, La., for libelant.

Chaffe, McCall, Phillips, Burke & Hopkins, Leon Sarpy, James G. Burke, Jr., New Orleans, La., for respondent.

William H. McClendon, Jr., Stuart A. McClendon, New Orleans, La., for respondent-impleaded.

J. SKELLY WRIGHT, District Judge.

Presenting facts strongly reminiscent of Grillea v. United States [1] the libelant, a longshoreman, claims damages against the respondent, owners of the Steamship Meiryu Maru, for injuries received while engaged in loading bales of cotton into the No. 5 hold of that vessel. Respondent has impleaded the stevedoring contractor, libelant's employer, alleging that any unseaworthy condition for which it may be liable was created by the stevedore.

Cotton is brought aboard vessels in the port of New Orleans three bales at a time on a pallet. Using ship's gear, the pallet is lowered into the hold through the hatch opening. When it arrives on the lower deck, or on the last tier of bales loaded which serves as a deck, the cotton is pushed on the pallet, while still in the sling, as near as may be to the place where it will be stowed.

Each tier of the cotton must be level, not only to keep the cotton from "rocking" in the stow, but also to provide a platform from which the longshoremen may load the next tier. In order to keep the tiers level, it is necessary to use dunnage toward the skin of the ship, particularly near the turn of the bilge where the end bale of cotton is not supported by the tier below. The tiers of cotton are tightened by "marrying" the center bales, that is, by forcing the two center bales in place at the same time. If holes in the tier nevertheless remain, those holes must be covered by dunnage, not only to support the next tier of cotton, but also to provide a safe and even platform from

---

1. 2 Cir., 232 F.2d 919.

which the longshoremen may load that tier.

On May 1, 1958, libelant and a crew of longshoremen employed by respondent-impleaded were in the No. 5 hold loading cotton. They had completed three tiers and were working on the fourth when libelant's steel hook, which is used to move the bales of cotton, slipped out of a bale, throwing libelant backward and into a hole which then existed between the bales in the third tier. He was assisted out of the hole by his fellow workers and the Japanese mate of the vessel who was supervising the loading.

Libelant relies on the now well defined line of jurisprudence which makes a vessel liable to a longshoreman for unseaworthiness, including unseaworthiness created by the longshoremen themselves.[2] The confusion concerning the length of time the unseaworthiness must exist, before liability therefor may be imposed, has now been cleared and the only question remaining is, was the vessel unseaworthy in fact at the time of the accident.[3]

The jurisprudence applicable to the facts here places respondents in a most difficult position. Admittedly libelant was hurt when he fell in the third tier of the cotton. Since this third tier of cotton was used by the longshoremen as a platform for loading the fourth, under the law it was required to be a reasonably safe place to work. Otherwise the vessel was unseaworthy.[4] Respondents say it was reasonably safe, that holes in the stow of cotton are inevitable and that a longshoreman must protect himself from such holes by making certain he does not step in one. This, they say, was the proximate cause of libelant's accident: libelant negligently, without looking, fell in a hole and hurt himself.

The facts show that libelant fell backward into the hole when his hook slipped from a bale of cotton. Whether the bale of cotton was rotten or poorly packed, as libelant sought to show, and consequently afforded an uncertain subject for libelant's hook, is beside the point. Inevitably, in handling cotton, even good cotton, hooks will slip and men will stumble backward. And if there are holes present in the stow large enough to receive a man, he will doubtless stumble into a hole.

Bales of cotton, of course, cannot be packed airtight. Small holes can be expected to exist in the stow. But all the evidence, including respondents', shows that when holes large enough to receive a man appear in the stow, those holes should be covered by dunnage.[5] It was the failure to cover the hole into which libelant fell with dunnage that was the proximate cause of the accident.

Since the hole in the stow made the platform provided by the third tier of cotton an unsafe place for libelant to work, the vessel is unseaworthy and her owners are liable for the damages caused by that unseaworthiness. Since the unseaworthiness was created by the employees of respondent-impleaded, the claim over must be recognized.[6]

The first position taken by respondents, of course, is that any unseaworthiness in the vessel was caused by libelant. But there is no proof of this. The proof shows that the longshoremen crew working in the hold created the unseaworthiness, which part of that crew is not shown. Consequently, it cannot

2. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Grzybowski v. Arrow Barge Co., 4 Cir., 283 F.2d 481; Grillea v. United States, supra.

3. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941.

4. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

5. Libelant sought to show that insufficient dunnage was available in the hold and that the Japanese mate refused to allow more to be sent down. Respondent as well as respondent-impleaded deny this.

6. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L. Ed.2d 413.

be arbitrarily said that because libelant was down in the hold working he in some way assisted in making the vessel unseaworthy.

In the alternative, respondents say that libelant was at least contributorily negligent and, therefore, his recovery should be made proportionate to his contribution to his accident. Again there is no proof of this allegation. Libelant fell backward into the hole when his hook slipped. Under the circumstances he certainly could not see where he was going to fall, and respondents have not successfully undertaken their burden of proving that his hook slipped because of his negligence.

Immediately following his injury on May 1, 1958, libelant was sent by his employer to an industrial surgeon, Dr. J. C. Minge, who made a diagnosis of lumbosacral strain and recurrent right inguinal hernia. The hernia was repaired on June 26, 1958. Thereafter Dr. Minge discharged libelant as able to return to work. When Alexander's back complaints continued, Dr. Minge referred him to Dr. Byron Unkauf, a Board certified orthopedist, who, after the failure of conservative treatment and a positive myelogram, removed a herniated disc between the fourth and fifth lumbar vertebrae. Although the laminectomy afforded Alexander some relief, his complaints of pain continued, and Dr. Unkauf has finally concluded that Alexander has a 10 to 15 per cent disability of his back and should no longer do longshoreman work.

Alexander's treating physicians were selected by his employer. Nevertheless that employer, respondent-impleaded here, has sought to prove by several other doctors that Alexander is a faker, that the myelogram which Dr. Unkauf and a qualified roentgenologist read as being positive was, in fact, negative, that Alexander had no herniated disc, that his operation therefor was entirely unnecessary, and that if, in fact, he has any present disability, it comes from the opera-

tion and from a pre-existing degenerative arthrosis.

Of course, it is not unusual to have a swearing contest between members of the medical profession. The unusual aspect of this particular contest is that the employer has brought in other doctors to swear against those it chose to treat its employee. Under the circumstances, although some of the doctors subsequently called by the employer are usually worthy of belief, here it would appear that the testimony of the treating specialist must be credited. According to his testimony Alexander should not return to longshoreman work. But this does not mean that Alexander is unemployable for all purposes. Consequently, though the fact that he cannot return to his occupation must be considered in determining damages, nevertheless it must also be borne in mind that Alexander is required under the law to minimize his damages by earning what he can.

The record shows that Alexander has been averaging almost $3,000 annually. But at the time of his accident he was already 55 years of age, and it is doubtful that he would have been able in any event to have continued full duty as a longshoreman for an appreciable period of time. Because of this fact and the further fact that an award for personal injuries is not subject to federal income tax, Alexander's loss of earnings from the date of his injury to the date of trial is estimated to be $6,000. While Alexander had a life expectancy as of the date of his accident of 17-plus years, his work life expectancy, of course, was considerably less. Moreover, as stated, though Alexander should not return to longshoreman work, he is not unemployable. Based on these considerations, the reduction of his future earning capacity is estimated to be $7,500. Pain and suffering is estimated at $4,000, and medical expenses not yet paid by his employer are proved to be $2,112, making a total award of $19,612.

Decree accordingly.