Georgios XYPOLITAS, Libelant,

v.

CARRAS USA LTD. and United Cross
Navigation Corporation,
Respondents.

United States District Court
S. D. New York.
May 31, 1960.

Gordon & Miller, New York City, for libelant. Moe Levine, New York City, of counsel.

Zock, Petrie, Sheneman & Reid, New York City, for respondents. Edwin K. Reid, New York City, of counsel.

DAWSON, District Judge.

This is an action by a Greek seaman for injuries allegedly received in an accident aboard ship, which he contends arose from the unseaworthy condition of the ship, i. e., an accumulation of oil or grease on the floor of the pump room, and which he alleges caused him to fall while working there.

The Court finds the following facts:

1. Libelant is a Greek citizen residing in Greece who served as an engineer on the S.S. Cristina.

2. The S.S. Cristina was a tanker registered under the law of Liberia, flying the Liberian flag and owned and operated by the respondent United Cross Navigation Corporation, a Liberian corporation. Respondent Carras USA Ltd. is an agent for the owner of the ship.

3. Libelant's employment on board ship commenced on January 29, 1957 at Portland, Maine, as an engineer, with a salary of 75 pounds ($210) a month, plus overtime and his found. His employment ended at Baltimore, Maryland, on July 10, 1958 when the voyage of the ship ended.

4. On July 2, 1957, while libelant was performing certain duties in the pump

room of the ship he slipped and fell, due to an accumulation of oil or grease on the floor in the area in which he was working. While the only evidence of the accumulation of oil or grease on the floor of the pump room is the testimony of the libelant, the Court accepts his testimony as to the existence of such accumulation, particularly since no evidence to the contrary was offered by the respondent. The area in which the libelant was working at the time was small and confined, but an examination of the photographic exhibits and consideration of the testimony leads the Court to accept libelant's testimony that he could have slipped in this area and hit his elbow and shoulder. At any rate, the testimony of the Chief Engineer was that the libelant reported to him on that day that he had slipped and fallen and injured his elbow.

5. Immediately following the accident libelant's left elbow became swollen and the left shoulder became painful. Libelant was relieved from his duties for a short period of time following July 2, 1957, but after this short interval, during which the libelant soaked his elbow and shoulder in hot compresses and massaged them, he continued to perform his customary duties until the ship finally reached the end of its voyage at Baltimore, Maryland, in July 1958, a period of approximately one year following the accident.

6. When the ship reached Puerto La Cruz in November, 1957, libelant was referred to the company doctor in that port. The company doctor examined him and recommended that he return to work on the ship. Five months later, in April of 1958, when the ship arrived at Campana in Argentina, the libelant went ashore and was examined by a physician of his own choosing. The physician's report was received in evidence. He found that libelant was suffering from a "post traumatic exuberant bony callous at the left elbow, with extremely painful bursitis, and he requires surgical treatment." Libelant returned to the ship and continued his work until the ship reached Baltimore

in July, 1958. At that time he was referred by the ship's doctor to the United States Public Health Service Hospital in Baltimore. He was admitted to this hospital on July 11, 1958. The diagnosis of the hospital (insofar as the injuries received on the ship were concerned) was that he had a spur on his left elbow and chronic myositis and tendonitis of the left shoulder and probable synovitis of the left shoulder. He also had hemorrhoids and on July 18, 1958 he was operated on for this condition and also for the removal of certain fatty tumors of a non-malignant type from the body. Also on July 18, 1958 an operation was performed for the excision of the spur from his left elbow. This was successfully done. The patient was considered fit for discharge on August 10, 1958 but he persistently complained of left shoulder pain. He was injected with hydrocortone and discharged by the hospital on August 14, 1958 as "fit for light duty for 10 days; to be further evaluated by the ship's doctor."

7. Upon discharge from the hospital in Baltimore, libelant came to New York. There he requested that the company give him further medical care and attention and he was finally sent by the company to Dr. Balensweig who examined him on October 8, 1958 and found that he was fit for duty. Thereafter, since he was still complaining of pain in the left shoulder, he reported to the United States Public Health Service in New York City. He was treated there from November 5, 1958 to November 12, 1958 and released with the recommendation that he be admitted to the United States Public Health Hospital on Staten Island for treatment and diagnosis. He was admitted to the Public Health Hospital on Staten Island on November 26, 1958 and remained there until December 18, 1958. The surgeon there found that libelant presented a partial ankylosis of the left shoulder which was not amenable to surgery and that there had been some atrophy of the muscles. The patient had an uneventful stay in the hospital and was discharged on December 18,

1958 as "not fit for duty," but "fit for travel on a ship, with a physician, or by airplane to his home."

8. Libelant was deported from the United States to Greece on April 9, 1959 and remained in Greece until he returned to the United States, for the purpose of attending this trial, in or about March 1960. During the time he was in Greece he performed no work. He was examined by physicians in Greece and given heat treatments there. The Court is unable to accept the contention of the libelant that during the entire time he was in Greece he was unable to do any work of any nature whatsoever. The motion pictures of libelant (to which reference will hereinafter be made) showed that libelant was grossly exaggerating his injuries and the Court is unable to accept his contention that he was incapacitated for any work.

9. Libelant called as a witness at the trial Dr. Irving Mauer who testified that libelant had a frozen shoulder which he could not move more than 90°; that this condition was permanent; that it was painful. He said that the only way that the pain could be removed would be to perform an operation for a shoulder fusion which would leave the shoulder completely rigid. Dr. Mauer testified "I think the shoulder was frozen at 90°," and "I also found limitation of rotation of the shoulder; the shoulder could not rotate." Dr. Mauer admitted that he had to base his conclusion to a certain extent on the subjective complaints of the libelant. There were no X-rays or other objective findings of the frozen condition of the shoulder.

10. Proceeding upon the basis that one picture is worth a thousand pages of testimony, the attorney for respondent called as a witness Louis Scotti, a private investigator, who produced and showed to the Court motion pictures taken of libelant during April 1959, immediately prior to the deportation of libelant to Greece. These motion pictures, taken while libelant was unaware that he was being photographed, showed very conclusively that libelant did not have a frozen left shoulder. They showed him walking down the street, briskly swinging his arms to and fro and carrying a bag in his right hand, out of which he was eating with his left hand; pointing to persons with his left arm and resting his chin on his left hand. They also showed him opening baggage at Pier 97, North River, and using his left arm for that purpose.

11. Dr. Balensweig, called as an expert for respondent, testified that on his examination of libelant he was convinced that libelant had no frozen left shoulder. He based this opinion particularly on the fact that he found no atrophy of the left shoulder muscles, which would have been the case if libelant had not been moving his left shoulder. Dr. Balensweig's finding and opinion are consistent with the actions libelant has shown in the motion pictures. Having observed the libelant on the stand and having listened to the testimony and observed the motion pictures, the Court finds as a fact that libelant does not have a frozen left shoulder. The difference between libelant's actions in the office of Dr. Mauer, and his testimony of the condition of his shoulder, as contrasted with his activity, as shown by the motion pictures, leads the Court to conclude that libelant was malingering and, so far as the complaint of permanent injury to his shoulder is concerned, that he is unworthy of credence. Libelant undoubtedly had some residual tenderness in his left shoulder resulting from trauma, but tenderness is not sufficient to warrant the apparent determination of the forty-three year old libelant to retire permamently from labor and to live on an award which he hopes will be made by the Court.

The Court concludes:

1. That the accumulation of oil or grease in the pump room of the ship made the ship an unseaworthy vessel and liable to a seaman for injuries caused thereby. See Mitchell v. Trawler Racer, Inc., 80 S.Ct. 926.

2. That as a result of the unseaworthy condition of the ship libelant was

caused to fall and injured his left elbow, resulting in the necessity of an operation to remove a bony spur therefrom.

 3. That as a result of the unseaworthy condition of the ship libelant was caused to fall and as a consequence suffered some inflammation and pain to his left shoulder, which condition, however, was not permanently disabling and is not disabling.

 4. That libelant is entitled to an allowance for maintenance for the period from August 14, 1958 to November 26, 1958, a period of 104 days, at the stipulated rate of $5 a day, or the sum of $520; and also for maintenance from December 18, 1958 to April 9, 1959, a period of 110 days at the stipulated rate of $5 a day, or the sum of $550; making a total allowance for maintenance of $1,070, as against which the Court credits the sum of $244, which admittedly was received by the libelant on account of maintenance. Total allowance for maintenance is therefore $826. It may well be that libelant was in a position to resume a gainful occupation prior to April 9, 1959. However, the Court has given him the benefit of the doubt by allowing him maintenance to the date on which he was deported to Greece, in the firm belief that by that time he was, as shown in the motion pictures and as indicated by the evidence, fully able to resume some gainful occupation.

5. The Court allows to libelant the sum of $1,680 for lost wages, that being eight months' wages at the rate of $210 per month, and covering the period from the conclusion of the voyage to the time that libelant was deported to Greece.

 6. The Court allows to libelant the sum of $5,000 for pain and suffering caused by the accident, the operation on his elbow and the residual stiffness of his left extremity.

The Court, therefore, directs that a total judgment for libelant be entered in the sum of $7,506.

This opinion will constitute the findings of fact and conclusions of law of the Court. Let decree be settled accordingly.