283 F.2d 481
 Henry GRZYBOWSKI, to his own use and to the use of Travelers Insurance Company, Appellant,
v.
ARROW BARGE CO., Inc., Defendant and Third-Party Plaintiff, Appellee.
ARROW BARGE CO., Inc., Defendant and Third-Party Plaintiff, Appellant,
v.
NACIREMA OPERATING COMPANY, Inc., Third-Party Defendant, Appellee.
 No. 8003.
 United States Court of Appeals Fourth Circuit.
 Argued January 14, 1960.
 Decided September 14, 1960.
 As Amended October 27, 1960.
 
 John J. O'Connor, Jr., Baltimore, Md. (O'Connor & Preston, Baltimore, Md., on the brief), for appellant, Henry Grzybowski.
 Randall C. Coleman, Jr., Baltimore, Md. (Ober, Williams, Grimes & Stinson, Baltimore, Md., on the brief), for appellee and appellant, Arrow Barge Co., Inc.
 Jesse Slingluff, Baltimore, Md. (Mathias J. DeVito and Piper & Marbury, Baltimore, Md., on the brief), for appellee, Nacirema Operating Co., Inc.
 Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 This is an appeal by a longshoreman from a judgment against him after denial of a motion for a new trial in his suit against a shipowner to recover damages for personal injuries.
 
 
 2
 Henry Grzybowski, an American longshoreman, was injured while engaged in loading cargo on an American steamship, the SS Joseph Feuer, owned by Arrow Barge Company, Inc. (hereafter called Arrow Barge). At the time of the injuries complained of, the vessel was under a charter from Arrow Barge to States Marine Corporation which, in turn, chartered her to agents for Calmar Steamship Corporation and she was then being loaded by Nacirema Operating Company under a stevedoring contract with Calmar Steamship Corporation. Out of various indemnity suits among these parties, only one remained at the conclusion of the trial and that was the direct third-party complaint of Arrow Barge against Nacirema, Grzybowski's employer, seeking indemnification in the event Arrow Barge should be held liable to plaintiff for his injuries.
 
 
 3
 Grzybowski alleges two causes of action against Arrow Barge. In the first he charges negligence in failing to provide a reasonably safe place to work; in failing to provide, install and maintain in proper, efficient and safe operating condition the equipment, gear, appliances and appurtenances of the vessel; in failing to make proper inspection to determine the existence of any unsafe conditions; in failing to take adequate precautions to prevent injuries to the plaintiff; in failing to prevent the dangerous and unsafe practice of "soaping" or lubricating "tracks" or other portions of the work area to reduce surface friction and speed the operation of sliding loads into position; in failing to provide a safe and seaworthy vessel and equipment and to maintain the same in a safe and seaworthy condition. For a second cause of action, after incorporating by reference all the specifications of negligence alleged for a first cause of action, he charges that, without fault on his part, he was injured solely by reason of the "unseaworthiness of the vessel as aforesaid."
 
 
 4
 Plaintiff demanded a jury trial and it was agreed that evidence be first taken on his case against Arrow Barge and that the case be submitted to the jury for special verdicts on issues of fact, the indemnity aspect of the case to be submitted to the court. Under this agreement, the court was to be bound by the jury's special verdicts, as far as they were applicable, but was to be free to make separate findings of fact upon any further issue that arose or upon any further evidence introduced at the trial of the various indemnity cases.
 
 
 5
 The injury to Grzybowski occurred when heavy packs of steel were being loaded in the No. 4 hold of the ship. One pack, weighing between three and one-half and five tons, was being lowered to be placed in position and, as it swung, the plaintiff's leg was pinned between the steel and the forward bulkhead. The night gang of stevedores had placed a tier of these steel packs over the entire area of the hold and, in so doing, used "tracks" made of scrap strips of lumber called dunnage, coated with a pine jelly soap. These tracks enabled the men to slide the packs into place more easily from the square of the hatch into the wings. The soap was supplied by Nacirema from its gear shop, it being the custom of Nacirema to have an adequate supply available to its longshoremen for the very purpose for which it was used on this and other occasions. These soapcoated tracks were not removed after the packs were placed.
 
 
 6
 There is conflict in the evidence with respect to the condition of the hold when the day gang, including Grzybowski, began work about eight o'clock on the morning of the accident. Witnesses testified that when they arrived there was grease or soap on top of the first tier or level of packs in the area of the hatch. Nacirema's superintendent saw no grease in the work area before the day gang began working. The only eye witnesses to the accident were plaintiff's fellow employees whose versions varied as to how the accident occurred.
 
 
 7
 In this loading operation, while each pack of steel was on the loading dock, a clamp was placed at each of the four corners of the pack. Cables from winches were attached to the clamps and thus the pack could be swung over the vessel's hatch and lowered into the hold. As each pack was lowered it was then swung or pushed into place by four longshoremen, one at each corner. The pack involved in the accident was the last one necessary to complete that particular tier or level. There was evidence that the winchman could not see into the hold and his operations were directed by a deckman; that a signal was given to the winchman to "shift the fall" of the load, and as the pack started to rise it began to swing toward Gryzbowski who then tried to jump upon it; that he succeeded in getting his left foot up but his right foot slipped in grease and his leg was caught between the pack and the bulkhead. This was the version of the plaintiff himself and one of his fellow workers. Another testified that plaintiff tried to make a break to get away from his position and could get only one leg out but he said nothing about slipping in grease. One witness said that plaintiff jumped on the pack and slid off, while another said that plaintiff jumped on the pack and fell back off. It was shown that, in his claim filed for compensation, plaintiff described the accident without any reference to slipping in soap or grease.
 
 
 8
 Questions to be answered categorically were submitted to the jury and, by special verdicts or answers, the jury found that the ship was not unseaworthy and there was no negligence on the part of the ship, the stevedoring company or the plaintiff himself.
 
 
 9
 The first question submitted to the jury, and the one with which we are primarily concerned, was as follows: "1. Was the SS Joseph Feuer at the time and place of the injury complained of unseaworthy as to the No. 4 hold?" The jury answered "No."
 
 
 10
 All of the evidence as to how the accident occurred presented a question of fact which, by agreement, was submitted for jury determination. If the jury concluded from the evidence that a slippery, dangerous and hazardous condition was created by the use of soap which was supplied by the stevedoring company and that the plaintiff was injured because he slipped on the soap, a question would be presented as to whether such use of this soap created an unseaworthy condition. Thus the court's instruction to the jury as to the character of the warranty of seaworthiness is vitally important.
 
 
 11
 It is now well settled that a shipowner's obligation to maintain a seaworthy vessel, traditionally owed by shipowners to seamen, extends to a stevedore who is injured while aboard and loading the ship, although employed by an independent stevedoring contractor engaged by the owner to load the ship. For purposes of the liability for injury, a stevedore is a seaman because he is doing a seaman's work, incurring seamen's hazards, and is entitled to a seaman's traditional protection.[1] Thus the shipowner's warranty of seaworthiness extended to the benefit and protection of Grzybowski as fully and completely as though he had been a member of the ship's crew.
 
 
 12
 Furthermore, a shipowner is not relieved of his responsibility and obligation even though the appliances, appurtenances and equipment used in the work are furnished by the stevedores themselves.[2]
 
 
 13
 Here the pine jelly soap, the use of which is asserted by the plaintiff to have created an unseaworthy condition which caused his injury, was furnished by Nacirema from its gear shop. Arrow Barge contended that, if any such unseaworthy condition existed, it was purely immediate and transitory, created by the stevedores themselves, including the plaintiff, for which it was not responsible. But this same contention was flatly rejected and repudiated in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941.
 
 
 14
 In that case, plaintiff, a member of the ship's crew, was injured as he prepared to leave the ship then in port, when he stepped upon the ship's rail which was slippery and covered at that point with slime and fish gurry which remained there from earlier unloading operations. The trial court instructed the jury that, in order to allow recovery upon either the negligence or unseaworthy count in the complaint, the jury must find that the slime and gurry had been on the ship's rail long enough for the shipowner to have learned of it and to have removed it. We quote from the Mitchell decision, 362 U.S., as follows:
 
 At page 542, 80 S.Ct. at page 928:
 
 15
 "In its present posture this case thus presents the single issue whether with respect to so-called `transitory' unseaworthiness the shipowner's liability is limited by concepts of common-law negligence."
 
 
 16
 At pages 548, 549, 80 S.Ct. at page 932 (quoting from Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 862):
 
 
 17
 "It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy."
 
 At page 549, 80 S.Ct. at page 932:
 
 18
 "There is no suggestion in any of the decisions * * * that the duty is any less with respect to an unseaworthy condition which may be only temporary." (Emphasis supplied.)
 
 
 19
 At pages 549, 550, 80 S.Ct. at page 933, (referring to Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601):
 
 
 20
 "That decision is thus specific authority for the proposition that the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. That decision also effectively disposes of the suggestion that liability for a temporary unseaworthy condition is different from the liability that attaches when the condition is permanent." (Emphasis supplied.)
 
 
 21
 In summary, as we interpret the Mitchell decision, the Supreme Court held that the character of the duty to provide a seaworthy vessel is absolute; that what is evolved is a complete divorcement of unseaworthiness liability from concepts of negligence; that, in determining whether the ship there involved was unseaworthy by reason of the slippery condition of the rail, it was immaterial how the slime got there, who put it there, how long it had been there or whether the shipowner knew it was there; that if the ship was thus rendered unseaworthy and the plaintiff suffered injury because of the condition, the shipowner was liable.
 
 
 22
 In the instant case the trial judge, in instructing the jury as to the issue presented by question No. 1 (the unseaworthiness of the No. 4 hold), told the jury that since ancient times a vessel and her owner are liable to indemnify a seaman for an injury caused by the unseaworthiness of a vessel or failure to supply and keep in order the proper appliances appurtenant to the ship; that this obligation has been extended to benefit the longshoremen who are injured in the course of their employment while aboard the ship, even though they are employed by independent contractors; that the shipowner's absolute duty to provide a seaworthy vessel is not affected by relinquishment of control to another; that the owner's duty to provide a seaworthy ship is an inalienable, nondelegable and continuing duty and proof of injury caused by the existence of the unseaworthy condition is all that is required to impose liability on the shipowner; that the shipowner is liable for any injury caused by a breach of this warranty of seaworthiness irrespective of the fact that reasonable care may have been exercised by the shipowner and even though there were no means of anticipating the trouble; that this obligation is a continuing one and extends to the condition of the deck and work area; that, on the other hand, the ship and her owners are not insurers of the safety of men working on board. A vessel does not need to be free from all causes of damage. It is enough if she be reasonably fit. This portion of the charge contained a correct exposition of the law with respect to the owner's duty to maintain a seaworthy ship.
 
 
 23
 But in a further explication of the unseaworthiness doctrine the lower court, not then having the benefit of the decision in Mitchell v. Trawler Racer, Inc., supra, and the principles so pointedly established thereby, told the jury:
 
 
 24
 "The doctrine of unseaworthiness does not extend so far as to require the owner to keep the appliances or work spaces which are inherently sound and seaworthy absolutely free at all times from transitory, occasional, immediate unsafe conditions resulting from their use." (Emphasis supplied.)
 
 
 25
 The trial court further charged that, in determining whether the ship was unseaworthy and whether it was or was not reasonably safe, the jury could consider the following facts: There were several gangs of stevedores working; there was a gang "carrier" over each gang, a foreman on the ship and a superintendent on the dock supervising the loading; there was no evidence in the case of any complaint made by the plaintiff or any of the other workmen to the gang carrier, by the gang carrier to anyone connected with Arrow Barge or Nacirema with respect to the unsafe condition of the hold and no evidence of any request that something be done by the ship to correct it.
 
 
 26
 Accepting and applying the decision in Mitchell v. Trawler Racer, Inc., supra, as in Puerto Seguro Cia. Naviera, S. A., v. Pitsillos, decided by this court June 20, 1960, 279 F.2d 599, we conclude the lower court erred in charging the jury that, in order to maintain a seaworthy ship, the owner is not required to keep the appliances or work spaces which are inherently sound and seaworthy absolutely free at all times from transitory, occasional or immediate unsafe conditions resulting from their use; also, that the jury could consider the absence of evidence of complaints as to the condition of the hold in determining whether the ship was or was not "reasonably safe" and seaworthy. In the Mitchell case, the court held that if the accumulation of slime and fish gurry created an unsafe condition, the shipowner would be responsible even though he had no notice, either actual or constructive, of the condition and a new trial was awarded on the issue of unseaworthiness. Similarly, in the case at bar, if the jury should find that there existed a slippery condition, even though transitory and immediate, resulting from the use of soap in the loading operation, the jury should determine further whether such conditions rendered the ship unseaworthy and, if so, whether the plaintiff's injury was attributable to the unseaworthy condition. But, in determining seaworthiness, no significance attaches to the fact that no one complained of the alleged unsafe condition. Neither notice of the condition nor lack thereof was material. The instruction as shown above in italics was in conflict with the Supreme Court's pronouncement that "what is evolved is a complete divorcement of unseaworthiness liability from concepts of negligence."
 
 
 27
 Plaintiff contends that since he was injured as a direct result of the unsafe, slippery and unseaworthy condition, the trial court should have directed a verdict in his favor. The evidence as to the cause of injury was conflicting and there was testimony from which the jury might have found that the injury was not caused by the use of soap. Therefore, even though the jury had determined that an unseaworthy condition existed, the motion for a directed verdict would have been properly denied.
 
 
 28
 For the reasons stated herein, the case will be remanded to the District Court with the direction that the plaintiff be awarded a new trial.
 
 
 29
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 862, 90 L.Ed. 1099; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Crumady v. The Joachim H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413
 
 
 [2]
 Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601; Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S. Ct. 849, 98 L.Ed. 1120, per curiam reversal of 3 Cir., 1953, 205 F.2d 57