John T. WYBORSKI, to His Own Use and as to the Use of Liberty Mutual Insurance Company,

v.

BRISTOL CITY LINE OF STEAMSHIPS, LTD., Respondent,

and

Oriole Ship Ceiling Company, Inc., Respondent Impleaded.

No. 4117.

United States District Court
D. Maryland,
Admiralty Division.
March 3, 1961.

Fred Ginsberg, Eugene Chircus, Baltimore, Md., for libellant.

Randall C. Coleman, Ober, Williams, Grimes & Stinson, Baltimore, Md., for respondent.

R. Roger Drechsler, David M. Buffington, Baltimore, Md., for Oriole Ship Ceiling Co.

CHESNUT, District Judge.

The important question in this case is whether the use of ship's "dunnage" in a particular way (to be hereafter described) rendered the ship *unseaworthy*.

The answer to this requires determination as to the present state of the admiralty law with particular reference to a longshoreman and shipowner; and further requires a careful consideration of the weight and probative force of the evidence. While important phases of the evidence are much in conflict, so much of the evidence as is not in dispute can be briefly stated.

On May 21, 1958 the British ship Montreal City, owned by the respondent in this case, the Bristol City Line of Steamships, Ltd., was docked at Port Covington in the Baltimore Harbor for the reception of a cargo of grain. The shipowner engaged the Oriole Ship Ceiling Company, an independent contractor, to prepare the ship for the loading of the grain. The libellant in the case, Wyborski, was a member of one of the so-called gangs of the Oriole Company. The leader of his gang, comprising about ten longshoremen, was one Zientak. His gang was engaged in preparing hold No. 3 of the ship; and other holds were also at the same time being prepared by other separate gangs, all of whom were under the general supervision of one Raber as foreman.

With respect to hold No. 3, the longshoremen under Zientak went on the ship about 8:00 A.M., and worked for about two hours in the lower hold, and then some or all of them proceeded to construct what is called a "feeder" in the 'tween deck of No. 3 hold. The feeder when constructed was a large chute or funnel of boards about 15 feet by 15 feet at the top, to act as a funnel for receiving the grain and distributing it more or less evenly as required for the whole cargo of grain to be stowed in the hold. In order to construct this feeder it was necessary for Wyborski, with one or more of his fellow longshoremen, to receive through the hatch on the upper deck, stout pieces of lumber, called studs, which were to be rested on hatch boards or other structures forming, in whole or in part, a floor at the 'tween deck level. But prior to receiving and putting in place the heavy lumber which, when completed would constitute the feeder, it was necessary for the libellant and others to place a temporary or false flooring at or about the 'tween deck level. This was done by placing boards athwart the ship resting on the beams or other structure of the ship so that Wyborski could stand on this flooring to receive and temporarily hold and put in place the studs that were required.

In order to do this work Zientak directed his gang to use for the temporary flooring what most but not all of the witnesses in this case referred to as the ship's dunnage which, it appears, was found in what were called refrigerators or lockers in the wings of the 'tween deck section of the ship. The libellant asserts, but Zientak denies, that this dunnage was improper and dangerous because it was "slippery" by reason of being coated with grain dust. Whether properly or not called dunnage the only positive description of these boards as to size was that they were one inch thick by six to eight inches wide, and they

were placed in two separate layers, one on the other, for the temporary flooring. The libellant, and one or two of his witnesses, testified to the effect that while standing on these boards with his right foot on one board and his left foot on another, and while receiving from the upper deck a large and heavy piece of lumber, the board on which his right foot was standing slipped a few inches forward by the upper board slipping against the lower board; and that this caused him to lose his balance and nearly fall, at the time feeling a sensation of a sharp pain in the lumbar region of his back and continuing into his groin. Later during the day he complained to Zientak that he had hurt himself (apparently without stating how or why) and was told to go to see the doctor, which he did; and thereafter he consulted the Oriole's doctor off and on for a period of several months but returned to work with his employer on June 23, 1958.

He filed a claim with the Deputy Commissioner under the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C.A. § 901 et seq.) and received total voluntary compensation payments from the insurer of Oriole, his employer, for temporary total disability in the amount of $254.57 (in addition to medical expenses in the amount of $86), without any hearing, ruling or award by the Deputy Commissioner. Upon his return to work these payments were discontinued. After several informal conferences with the Deputy Commissioner regarding the claim, he gave notice of his election to sue the ship and thereafter this suit was filed on September 8, 1959, some 16 months after his injury.

The libellant made no claim on the ship until the filing of the suit; and the ship had no knowledge or notice of any kind of any injury to the libellant until about eleven months after the accident when informed of the prospective suit by the Liberty Mutual Insurance Company, the insurance carrier for Oriole.

The suit is in the from of a libel in personam alleging (1) that the libellant's injury was due to the negligence of the ship and (2) to its unseaworthy condition by reason of the alleged negligent use of the dunnage.

■ To shorten the discussion, I will say at once that after hearing all the evidence I find no evidence legally sufficient to show negligence on the part of the ship; and the resulting question for further consideration is whether the dunnage as used made the ship unseaworthy. As to the latter, the contention of the libellant is that the ship, being obliged to furnish a safe place to work, failed to do so in that it *provided* unsafe material for the temporary flooring; while the contention of the shipowner is that the material used was ship's dunnage which was fit for its proper use as dunnage in the protection primarily of the cargo in the hold, but was improperly selected and used for an entirely different and other purpose by reason of the negligence of the Oriole Company which has been impleaded under Admiralty Rule 56, 28 U.S.C.A. The precise jurisdiction of the court is in admiralty and is not a civil action, as apparently it might have been if so elected by the libellant. A jury trial was not prayed by either party and ordinarily could not have been as the jurisdiction is in admiralty only. Romero v. International Terminal Operating Co., et al., 1959, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368; Carter to Use of St. Paul Mercury Ins. Co. v. Baltimore and O. R. R. Co., D.C.Md., 166 F.Supp. 307.

With regard to the present state of the admiralty law it is interesting, if not conclusive in this case, to determine whether the ship could properly be found liable because unseaworthy as to some of its essential appurtenances, *if* the respondent's contention as just stated is correct. The answer to that question is, I think under the present authorities, a rather close one. Why this is so will appear from a rapid but very condensed survey of the present state of the admiralty law on the point.

The applicable law with respect to the rights and duties of the ship and its seamen and members of the crew, was

888

fully and carefully stated by the Supreme Court in the case of The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. By it the ship was liable to the seaman if his injury was due to the failure of the shipowner to provide a reasonably safe ship. See Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. In 1920 Congress passed the Merchant Marine Act, 46 U.S.C.A. § 688, sometimes called the Jones Act, which materially affected the liability of the ship to the seaman with respect to former doctrines of assumption of risk and contributory negligence.

In 1927 Congress passed the Longshoremen's and Harbor Workers' Compensation Act providing compensation insurance (based on liability without fault) for the benefit of longshoremen injured on navigable water similar in principle to Workmen's Compensation Acts of the several States; but expressly excluding its application to the crew of a ship. The occupation of a longshoreman was generally regarded as different in category from that of a member of the crew although it was held in International Stevedoring Co. v. Haverty, 1926, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157, that for some purposes the longshoreman could be regarded as a seaman. And importantly it is to be noted that in 1946 the Supreme Court held that a longshoreman although entitled to the benefits of the Compensation Act, also had the right to sue the shipowner for injuries resulting from the unseaworthiness of the ship, the same right as the seaman. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. This step in the development of the admiralty law has resulted in many nice questions affecting the relationship of shipowners and longshoremen, including particularly cases where, while some part of the ship's appurtenances have been unsound, the longshoreman's injury was proximately due, or directly occasioned in a particular case, by the fault of the stevedoring company, his employer. As the Longshoreman's Act provides that the liability of the employer to his employee is limited to the insurance coverage provided in the Act, the ship may not shift the burden, in whole or in part, to the stevedoring company as an independent contractor merely for a partial relief as a joint tort-feasor (Halcyon Lines v. Haenn Ship Ceiling & Refitting Co., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318); but may in proper cases shift the whole responsibility to the stevedoring company as the employer of the longshoreman for full indemnity where the longshoreman's employer has failed to perform its contract with the ship in a "workmanlike manner". Ryan Stevedoring Co., Inc. v. Pan-American S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Weyerhauser S.S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491.

In support of its position in this case the shipowner relies strongly on Blankenship v. Ellerman's Wilson Line, 4 Cir., 1959, 265 F.2d 455, 457. In that case the carpenter longshoreman was an employee of the Oriole Company and was injured while standing on a scaffold nailing a piece of timber to the wall of the hold. A draft of lumber being unloaded by other members of the gang struck the scaffold and thereby caused the injury to the plaintiff. He contended that the ship was made unseaworthy by reason of insufficient lighting in the hold; but the shipowner answered that the lighting, while originally sufficient, had been impaired by the negligent action of the stevedores. The plaintiff requested an instruction that such negligence of the stevedores was no defense. On this point the opinion of Judge Soper stated:

" * * * the courts have not as yet generally accepted the view that the obligation of seaworthiness has been so extended that a seaman may now recover damages from the shipowner for injuries caused by the negligence of a stevedoring contractor contemporaneous with the use of seaworthy appliances whereby a condition of unseaworthiness is created."

An examination of some of the cases cited pro and con by Judge Soper, particularly Petterson v. Alaska S.S. Co., 9

Cir., 205 F.2d 478, affirmed 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Grillea v. United States, 2 Cir., 232 F.2d 919, at page 922, are illustrative of the difficulty of the application of the admiralty law as it presently stands to the precise problem here involved. See also two recent cases dealing with somewhat similar situations: Arena v. Luckenbach S.S. Co., 1 Cir., 1960, 279 F.2d 186; Casbon v. Stockyards S.S. Corp., D.C.E.D.La. 1959, 173 F.Supp. 845. Since the Blankenship case the Supreme Court has decided the case of Mitchell v. The Trawler Racer, 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; and the 4th Circuit in an opinion by Circuit Judge Boreman (Grzybowski v. Arrow Barge Co., 1960, 283 F.2d 481) has again considered another longshoreman case against the ship particularly in the light of the Mitchell case; but as I read the opinions in these later cases the holding in the Blankenship case has not been overruled or modified. The libellant in the Mitchell case was a seaman and not a longshoreman; but the opinion deals at length with the historical development of the doctrine of seaworthiness as a basis for a suit by a seaman. It reaffirms what has been considered the admiralty law in that respect at least since the Osceola case, supra. As to what constitutes seaworthiness in general, it was said in the opinion of Mr. Justice Stewart (362 U.S. 539, at page 550, 80 S.Ct. at page 933):

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." I do not understand that any change is noted in the content of what constitutes seaworthiness which, shortly stated, has been and still is that owner warrants the ship to be sound with respect to its hull, appurtenances and stowage. The opinion is notable also in its emphasis that the warranty of seaworthiness is quite different in effect from negligence of the ship or the seamen; and it also seems to eliminate a shipowner's contention that mere temporary or so-called "transitory" condition of unseaworthiness is excusable. And that now is seemingly entirely clear from the 4th Circuit opinion in Grzybowski, supra.

As the Blankenship case still stands as the authority in this Circuit, it should, of course, be applied here if the facts here in evidence present a case of substantial similarity. But in passing it must be noted that the present contention of the respondent is not precisely the same as that in Blankenship. There the shipowner's contention was that the lighting was entirely good for the purpose intended and for the use to which it was put, but was rendered insufficient by the positive negligent act of the stevedores; while in the instant case the dominant issue of fact in the evidence is whether the dunnage was or was not originally provided by the ship for the use to which it was put. Again, bearing in mind the duty of the ship to furnish safe materials for the stevedores, which duty the ship could not delegate, the question is whether in this case the ship did provide sound lumber material for the flooring.

I come next to a consideration of the evidence of the case. This presents difficulty due very largely to the fact that the ship had no knowledge or notice of the libellant's injury until nearly a year after its occurrence. As I have noted in numerous other cases involving a similar situation, the ship is at a very great disadvantage in defending a claim of alleged unseaworthiness brought to its attention for the first time a year or more after the occurrence and, as in this case, after the ship involved had changed ownership and the crew had been dispersed.

And the case is more difficult for the ship by virtue of the nature of the particular business. The stevedoring company is employed as an independent

contractor to do the work and the ship's officers and crew have no obligation to inspect or supervise it in detail while it is being done. It results that evidence as to just what did happen at the time of the injury comes ordinarily only from the injured longshoreman and his immediate associates on the job. Thus in effect the only evidence available in a trial of the case years later is the evidence of the plaintiff and his associates, naturally friendly.

As above stated, the position taken by the libellant is that the lumber used for the temporary flooring 'tween decks was *provided* by the ship for that use. Of course the burden of proof was on the libellant to establish by a preponderance of the evidence that this was so and that its defective condition was the proximate cause of the injury. The evidence on the point as to whether the lumber was unfit for such use consists principally of the testimony of the libellant corroborated substantially by two other witnesses who were his co-workers. In substance the testimony was to the effect that they were told to get the lumber from the lockers, sometimes called the refrigerator; that they did so and found that it was slippery by reason of being coated with grain dust; that they complained about this condition and that one of them went to Zientak and stated that it was unfit and dangerous for use but the latter ignored their complaint and in effect told them to go on with it or to quit the job if they preferred; and that as they were dependent upon their wages, they went on as directed. Zientak testified in effect that neither the libellant nor any of his associates complained to him that the lumber was unfit for use and that when he had examined it before using it, he found it suitable. After hearing the three witnesses referred to, I think the preponderance of the evidence considering quantity and character and bearing in mind the personal interest of the libellant as to the outcome of the case, was nevertheless in favor of the libellant.

As to whether the lumber was provided by the ship, I think the most important consideration of the evidence is, what was the custom of the business as between the ship and the Oriole Company. It was that when the stevedores boarded the ship they received instructions from the chief officer to prepare certain holds, including hold No. 3, for the reception of the grain. How this was to be done was a detail left to the Oriole Company and was not directly supervised or inspected by the ship's crew for the doing of the work. By the custom of the business the stevedoring company is expected to use the ship's lumber to the extent that it is suitable for the job; and to order at the expense of the ship, such additional lumber as may be required. See particularly the testimony of the Oriole foreman, Raber. It is important to bear in mind, however, that in general it was the duty of the ship to provide the stevedores with suitable tools and appliances for the work to be done. When the foreman of the Oriole Company, or the gang leader for a particular hold, looks over the situation and ascertains what lumber material is available on the ship for the work, he determines to what extent it is suitable and orders from outside supply such additional lumber as is necessary for the job; and the cost of such outside material is charged to the ship by the Oriole Company. In the particular case outside material was ordered by the foreman especially for lumber required to complete the chute or funnel for No. 3 hold.

The libellant testified that after the temporary flooring had been laid he was standing with his right foot on one of the boards and his left foot on another and while receiving a heavy piece of lumber from the deck, the layer of boards under his right foot slipped a few inches from the board beneath it, thus throwing him off balance and causing his injury. At least one of his fellow workmen at the time corroborated that statement. There was no testimony to the contrary. As the ship had no notice or knowledge of

the incident until about a year later, it was not in a position to provide any witnesses to the occurrence. In fact the only evidence offered on its behalf was that of the former chief officer of the ship, then on duty on another ship of the same Line, which was to the effect that the use of "dunnage" as a floor for the construction of the feeder was entirely improper and was not the normal use for it but that on the contrary, according to his experience, such a temporary flooring as was necessary in the particular case should have been supplied by hatch boards; and that dunnage is never used to construct a feeder which is made from new smooth lumber to facilitate the loading of grain, and that after a voyage is completed the new lumber is down-graded for use as dunnage. And he said the ship had not carried any grain for at least two months prior to May 21, 1958 when the libellant was injured. It will have been noticed that all the witnesses in this case refer to the use of "dunnage" but it seems that the term had different meanings to the different witnesses;[1] that is, for instance, all the libellant's witnesses spoke of the boards used for the temporary flooring as dunnage but the term dunnage was obviously understood in the deposition of the chief officer for the ship as rough or down-graded lumber not suitable for use in the construction of a feeder. Apart from the term used, the only description that we have of the boards used for the flooring was that they were one inch thick by eight inches wide. The complaint about their condition was not that they were not strong enough to bear the weight of

the man standing on them but only that they were slippery from grain dust.

■ I have given close consideration to the appraisal of the evidence in this case. I realize that in admiralty especially the findings of fact by the trial judge should be and are of considerable importance especially in a case involving the difficult question of admiralty here involved. I also bear in mind that there is a difference with respect to the weight and importance of findings of fact in admiralty from the rule applicable to civil actions. On an appeal in admiralty the case is open for further consideration on the evidence by the appellate court, including the possibility of hearing additional evidence. A recent illustration of this rule in admiralty is the case of Petterson v. Alaska S.S. Co., supra.

■ On consideration of the whole of the evidence, I conclude that the preponderance is in favor of a finding that in the particular instance the material used by the Oriole Company for the temporary flooring for the building of a feeder was provided by the ship and would have been reasonably suitable for the specified use, provided it had not been slippery from grain dust, and that its use for that purpose was a negligent action of the Oriole Company through its agent, the leader of the libellant's gang, although he had been warned of its dangerous character before the occurrence of the accident; and for this reason the ship was unseaworthy by the use of the defective material.

■ A reading of numerous cases involving suits by longshoremen against

1. The definition of dunnage as found in the International Maritime Dictionary by Rene de Kerchov is as follows:

"A term applied to loose wood or other material used in a ship's hold for the protection of cargo.

"Dunnaging serves the following purposes according to the nature of the cargo carried:

"1. To protect it from contact with water from the bilges, or leakage from other cargo, from the ship's side, or from the double bottom tank.

"2. To protect it from contact with

moisture or sweat which condenses on the ship's sides, frames, bulkheads, stringers, brackets, and so on, and down on the cement caps, from where it finds its way into the bilges.

"3. To provide air passages for the heated, moisture-laden air to travel to the sides and bulkheads along which it ascends toward the uptakes.

"4. To prevent chafing as well as to chock-off and secure cargo by filling in broken stowage, i. e., spaces which cannot be filled with cargo."

ships for alleged damage due to unseaworthiness of particular appurtenances will show in recent years since the Sieracki case, supra, very many instances in which the ship has been held unseaworthy despite the fact that the plaintiff's injury was principally due to the fault of the stevedoring company. For instance, in the Petterson case, supra, the faulty appurtenance was in fact brought on board the ship by the stevedores, as also in the Casbon case, supra; see also Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, per curiam reversal of 3d Circuit, 205 F.2d 57; Crumady v. The J. H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; and may other cases. In reading many of these cases I think it is interesting to search for the dominant reason in admiralty law for this conclusion. It seems to me to flow from the following syllogism: (1) The shipowner warrants the ship to be seaworthy; (2) seaworthiness in general requires the hull, the rigging and the stowage to be reasonably fit and this has been extended to include the ship's appurtenances necessary for safe working by the seamen; (3) when the appurtenance is necessarily used in the performance of the work it seems to have been integrated into the ship which must be seaworthy as an entity; (4) that this duty of the ship to supply sound appurtenances cannot be delegated, and (5) therefore, when such an appurtenance is provided even by the mistake of the stevedoring company it becomes a part of the ship for the work to be done, and as the shipowner's duty cannot be delegated, he is responsible to the seaman, and (under Sieracki, supra) to the longshoreman, despite the fault of the stevedoring company. The question whether the stevedoring company is responsible over to the shipowner is a separate and subsequent matter to be decided, as between the ship and the stevedoring company.

I come now to a consideration of what pecuniary damages would be compensatory for the libellant. This involves a discriminating appraisal of the evidence in the case, chiefly medical, as to the extent of his physical injuries proximately caused by the accident. Without extending this opinion in greater detail, I find that the chief injury sustained by him was a sprain of the back in the lumbar region and that there was no ruptured disc in the vertebra or other bone breakage. It also appears from the libellant's own evidence that about a year before the injury here sued for, he sustained an injury to the same part of his back in handling a heavy piece of timber, in consequence of which he received some advice or treatment from his employer's doctor, and that the injury troubled him for about six months although he lost no wages on account of it. I find the testimony of the doctors representing the Oriole's insurance carrier, and the testimony of Dr. Johnson, testifying for the ship with respect to the extent of personal injuries, more convincing than other medical testimony in the case.

I further find that as a result of his injuries the libellant lost about five weeks wages and probably lost some further daily work from time to time thereafter owing to continuing discomfort from his injury; but I do not find that the total amount of further lost time can be determined with particularity from the libellant's own testimony to the general effect that thereafter from time to time he lost two or three days work. This was not documented with any particularity and viewing the evidence as a whole, is not sufficiently persuasive to justify a large allowance on consideration of all the testimony in the case. I have considered the figures based on his income tax returns over a period of years which varied from a high of about $8,000 for 1957 to a low of about $5,000 in 1958, and in later years about $6,000 to $7,000. It is, I think, a matter of common knowledge that the work of a stevedore on the waterfront is hard, exacting, laborious, frequently resulting in physical injuries, and demanding and receiving a high hourly rate of compensation; and that the volume of the business from year to year is dependent in

a substantial degree on the amount and steadiness of work for longshoremen and harbor workers.

■ On the whole evidence I find that fair compensation to the libellant for his injuries to the extent shown to have been proximately due to his accident is $3,500. His counsel contends for a greater sum largely based upon the argument as to loss of wages and extent of physical disability. I have considered these factors and have also included in the allowance compensation for pain, suffering and discomfort over a period of time. I do not find the evidence sufficient to establish permanent injury proximately resulting from the accident.

■ The remaining question in the case is whether the shipowner is entitled to be indemnified by the Oriole Company for this amount of damage. I conclude that it is. The selection of the lumber for use in this case was the action of the agent of the Oriole Company and not of the ship's officer or crew. Zientak, the gang leader, was specifically notified of the dangerous condition of the material selected for the flooring but ignored or put aside the libellant's protest. It was his mistake, according to the weight of the evidence, that was the real cause of the damage to the libellant. When the complaint was made to him of the unsuitable condition of the dunnage, the Oriole Company had the opportunity to order proper lumber for the flooring at the expense of the ship, but failed to do so. Therefore, while I have found the ship unseaworthy with respect to the use of the so-called dunnage, that would not have been the proximate cause of the libellant's injury except for the unworkmanlike manner in which Oriole performed its contract with the shipowner. Accordingly the decree will be in favor of the libellant in the sum of $3,500 as against the shipowner with the further provision that the shipowner is entitled to indemnity in the amount of $3,500 to be paid to it by the Oriole Company. Counsel can agree upon and submit a form of decree to be signed in accordance with these principles.

In addition, counsel for the shipowner has requested the allowance of expenses and counsel fees for services performed at the instance of the shipowner. While this subject was briefly mentioned at the conclusion of the hearing of the case, I do not think it was sufficiently developed to be the basis of a present order, especially as I believe counsel for the Oriole Company did not have sufficient opportunity to reply to the request. I therefore reserve that matter for possible further consideration unless counsel can agree upon the matter without further hearing. See Holley v. The Manfred Stansfield, D.C.E.D.Va.1960, 186 F.Supp. 212 and 186 F.Supp. 805.