**Alvin HURST, Plaintiff,**

v.

**CENTRAL GULF STEAMSHIP COR-PORATION, Defendant.**

**No. 7196.**

United States District Court
E. D. Louisiana,
New Orleans Division.

April 27, 1967.

George W. Reese, Donald M. Pierce, New Orleans, La., for Alvin Hurst.

Joe L. Horne, New Orleans, La., for Central Gulf Steamship Corp. and Atlantic & Gulf Stevedores, Inc.

RUBIN, District Judge:

## FINDINGS OF FACT

1. Alvin Hurst was employed by Atlantic & Gulf Stevedores, Inc. ("A & G"), as a longshoreman on August 15, 1964, to work aboard the SS GREEN VALLEY a vessel owned by Central Gulf Steamship Corporation ("Central Gulf"), and then moored at the New Orleans Army Terminal.

2. Hurst was an experienced longshoreman and had been a member of the regular gang of Foreman Anthony Hammer for many years.

3. Hurst was assigned, together with his co-workers Frank Harris and Nelson Richard, also experienced longshoremen, to the No. 1 lower hold to stow incoming cargo consisting of fifty-five gallon drums and five gallon pails of lubricating oil.

4. The SS GREEN VALLEY was partly loaded with other cargo brought aboard in New Orleans including several hundred skids of tinplate already in the bottom portion of the lower hold.

5. Good stevedoring practice requires that metal objects be separated by dunnage for proper stowage.[1]

6. A dunnage floor that is not regular and fairly even creates a hazardous condition, unsafe to longshoremen. Poor quality or thin dunnage also creates a dangerous condition.

7. The surface of the tinplate stored in the SS GREEN VALLEY was irregular, and there were high and low areas. In addition, there were gaps between portions of this cargo. Therefore, in accordance with the instructions of their foreman, the longshoremen filled the empty spaces with some of the five gallon pails. Then atop this layer of cargo they built a floor out of dunnage. While they were at work, Foreman Hammer went to get more dunnage at a storage shed ashore several hundred feet away.

8. The dunnage used consisted of planks brought aboard the ship in bundles

---

1. The definition of dunnage found in International Maritime Dictionary by Rene De Kerchov is as follows: "A term applied to loose wood or other material used in a ship's hold for the protection of cargo.
Dunnaging serves the following purposes according to the nature of the cargo carried:
1. To protect it from contact with water from the bilges, or leakage from other cargo, from the ship's side, or from the double bottom tank.
2. To protect it from contact with moisture or sweat which condenses on the

ship's sides, frames, bulkheads, stringers, brackets, and so on, and down on the cement caps, from where it finds its way into the bilges.
3. To provide air passages for the heated, moisture-laden air to travel to the sides and bulkheads along which it ascends toward the uptakes.
4. To prevent chafing as well as to chock-off and secure cargo by filling in broken stowage, i. e., spaces which cannot be filled with cargo."
Cited with approval in Wyborski v. Bristol City Line, D.Md., 1961, 191 F. Supp. 884.

by A & G for that purpose and laid side by side and end to end, touching each other or very nearly so. This dunnage was not of first rate quality.

9. One or more members of the crew of longshoremen in which Hurst was working complained to the derrickman about the quality of the dunnage and about the fact that there was not sufficient dunnage to make the floor level. The derrickman told the longshoremen that the foreman was not there and that they should use what they had.

10. No complaint was made by Hurst.

11. After the dunnage floor was built, fifty-five gallon drums were lowered into the No. 1 hold six at a time, by the use of barrel hooks. Each load of drums landed with the drums' long axis in a horizontal position. As each draft of cargo was landed in the square of the hatch, the drums were rolled to the after end of the lower hold and "headed up" to stand on end, bung side up, close to drums already loaded.

12. No special runners were laid by the longshoremen, and no dollies, or special tracks were used to roll the drums from the square of the hatch to the point where they were headed up.

13. The surface of the dunnage floor was irregular, containing high and low spots, but it was not so irregular as to prevent ready rolling of the drums across it.

14. The entire first layer or tier of drums was completed, and a dunnage floor was again laid. Work began on the second layer or tier of drums. There were fewer irregularities in the second dunnage floor than there were in the first dunnage floor because the placement of the load of drums and the laying of the second dunnage floor tended to even the high and low spots.

15. As in the case of the first layer, when the second layer or tier of drums approached completion, the area in the square of the hatch became surrounded by drums standing on end. In order to fill this area or "hole" one or two long-shoremen stood in the area. As drafts of cargo were lowered, they were landed on the standing drums. Then longshoremen working atop the standing drums grasped a drum, turned it with the bung end up, and lowered it into the hole where other longshoremen guided it into place alongside the other drums standing on end.

16. After the hole became partially filled, and became a fairly small area, only one man remained in it to guide entering drums. This was because the lack of space made it dangerous for two men to work there. If one man lost control of a drum, it might bounce or roll and thus create a dangerous condition; the other longshoreman might have his back turned and might be unable to avoid the hazard.

17. The last two or three drums used to complete the tier were usually dropped into place without anyone remaining in the vanishing hole to guide them.

18. When each tier was completed, the spaces between drums, if any, were chocked with dunnage to prevent shifting of the drums.

19. Shortly after the noon meal on August 15, 1964, the third tier of drums was nearly complete. The dunnage floor placed on top of the second tier was less irregular than the other two dunnage floors, but it still contained high and low places. Hurst was the longshoreman remaining in the unfilled space to head-up the drums needed to complete it.

20. Frank Harris rolled a drum to the edge of the third tier, and, holding it bung end up, lowered it into the hole to Hurst.

21. As the drum was lowered, it struck a high place on the dunnage floor and broke one of the dunnage boards. The drum then bounced and the top edge of the drum struck Hurst's left foot.

22. Hurst immediately climbed out of the hole and removed his shoe. He reported the incident and left work to obtain medical care.

23. Plaintiff remained under treatment until December 21, 1964, a period of 18⅞ weeks.

**68**

24. Plaintiff's average weekly wage prior to the accident was $131.20. Plaintiff lost earnings in the amount of $2,399.09.

25. The plaintiff's medical expense was $314.35.

26. Plaintiff suffers from a permanent disability resulting in a partial loss of use of the left leg and a permanent limp. This disability is estimated at 5% of total disability.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this suit.

■ 2. The shipowner warrants to members of the crew, including longshoremen charged with the duty of loading the vessel with cargo, that the vessel and its gear will be reasonably fit for their intended use.[2] This duty is absolute.[3]

■■ 3. The shipowner is not required to provide an "accident free" ship. He is under a duty "only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." [4]

■ 4. Dunnage is a part of the gear of the vessel,[5] and the shipowner's warranty of seaworthiness requires him to provide dunnage that is reasonably fit for the intended purpose.[6]

■ 5. The dunnage floor installed in the SS GREEN VALLEY was so irregular as not to be reasonably fit for its intended use. The irregular condition of the dunnage floor created a hazardous condition and made the vessel unseaworthy.

■ 6. In addition, the failure to furnish dunnage of a quality reasonably fit to make a floor for the storage of fifty-five gallon drums created a further hazardous condition, also making the ship unseaworthy.

■ 7. The plaintiff used due care in the performance of his duties, and was not guilty of contributory negligence.

■ 8. The proximate cause of the accident in which the plaintiff was injured was the unseaworthiness of the vessel.

■ 9. The plaintiff is entitled to an award of $2,500.00 to compensate him for his pain and suffering during his period of disability, and to an award in the amount of $6,000.00 to compensate him for his partial permanent disability. In addition, the plaintiff is entitled to judgment in the sum of $2,399.09 for lost wages and $314.35 in medical expenses, with recognition of the right of A & G and its insurers to repayment of the sum of $2,069.25 paid to plaintiff in compensation and $314.35 paid for his medical expenses.

The Clerk will prepare a judgment in accordance with the findings of fact and conclusions of law, awarding interest from March 22, 1965, until paid, at the rate of Five (5%) percent per annum.

2. The Osceola, 1903, 189 U.S. 158, 23 S. Ct. 483, 47 L.Ed. 760; Mahnich v. Southern SS Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

3. Carlisle Packaging Co. v. Sandanger, 1922, 259 U.S. 255, 42 S.Ct. 475, 66 L. Ed. 927.

4. Mitchell v. Trawler Racer Inc., 1960, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941, 948. See also Mills v. Mitsubishi Shipping Co., 5th Cir. 1966, 358 F.2d 609.

5. Matthews v. Compania Anonima Venezolano de Navegacion, E.D.La.1964, 234 F.Supp. 553.

6. United States Lines Co. v. Williams, 5th. Cir. 1966, 365 F.2d 332.