**Carmen LUSSON, et al., Plaintiffs,**

v.

**James CARTER, et al., Defendants.**

**Civ. No. 77–700(PG).**

United States District Court, D. Puerto Rico.

Aug. 15, 1983.

Feldstein, Gelpi, Toro & Hernandez, San Juan, P.R., and Arthur Abarbanel, Shulman, Abarbanel & Schlesinger, New York City, for plaintiffs.

Jose A. Gonzalez Gierbolini, Asst. Dist. Atty., Dept. of Justice of P.R., San Juan, P.R., for Carlos Romero Barcelo and Julia Rivera de Vicenti.

Herbert W. Brown III, Asst. U.S. Atty., San Juan, P.R., for United States of America and James Carter, President of U.S.A.

Jimenez & Fuste, San Juan, P.R., for Shipowners & Merchants Towboat Co. & for intervenor Caribe Tugboat.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief District Judge.

This cause came to be heard on remand after the United States Court of Appeals for the First Circuit vacated the portion of our judgment of dismissal against co-defendant, Shipowners & Merchant Towboat Co., Ltd. ("Shipowners"). The dismissal against Caribe Tugboat Corp. was affirmed. We were asked to reconsider whether Shipowners is a statutory employer under 11 L.P.R.A. 20, and, therefore, immune from suit, according to 11 L.P.R.A. 21. In the alternative, the Court of Appeals asked us to address the defense originally urged by defendants, that Shipowners

had so parted with the control of the vessel prior to any unseaworthy condition that it cannot be held liable for injuries resulting from such a condition. *Lusson v. Carter*, 704 F.2d 646 (1st Cir.1983). See original Opinion by this Court, Appendix A to the present Opinion and Order.

Plaintiffs are the dependent widows and children of two seamen, Louis Lusson and Robert Bousson, who died as a result of injuries they sustained on December 17, 1976, while working aboard the Tug "SEA RACER" in the harbor of San Juan, Puerto Rico. The decedents were employed by Caribe Tugboat Corp., a Louisiana corporation authorized to do business in Puerto Rico. Shipowners, a California corporation, owned the tug. Under Puerto Rico law, if a seaman or maritime worker is covered by the Puerto Rico Workmen's Accident Compensation Act (PRWACA), his only remedy against his employer is the compensation provided under the statute. Caribe had insured its seamen working in Puerto Rico waters and the benefits under PRWACA would be paid to plaintiffs. Plaintiffs are not able to recover against Caribe under the Jones Act, 46 U.S.C. § 688, and/or under the General Maritime Law. See *Gen. Fonseca v. Prann*, 282 F.2d 153 (1st Cir.1960); *Cáceres v. San Juan Barge Corp.*, 520 F.2d 305 (1st Cir. 1975); *Garcia v. Friesecke*, 597 F.2d 284 (1st Cir.1979), cert. denied 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979); *Lusson v. Carter, supra.*

In our original Opinion, we held Caribe immune from suit as employer and Shipowners, the tug owner, an immune statutory employer under *Garcia v. Friesecke, supra.* Plaintiffs now claim as per issues on remand that the tug owner is liable for unseaworthy conditions arising before a demise charter to Caribe. Shipowners claim is to the contrary. Based on *Ramos v. Beauregard, Inc.*, 423 F.2d 916 (1st Cir. 1970), the defendant claims that any unseaworthy condition arose after a bareboat charter party went into effect. Furthermore, Shipowners claims that, in any event, our original ruling granting said defendant

the statutory employer benefits under PRWACA was well taken and that dismissal under said additional ground is warranted.[1]

This Court received testimony on the issues on remand on the 28th of June and 11th of July, 1983. Based on the testimony and documentary evidence received, and taking into consideration a further stipulation by the parties on the issue of the demise charter,[2] we find as follows:

1) At the time of the casualty object of this suit, that is, December 17, 1976, the tug SEA RACER had been bareboat chartered by its owner Shipowners & Merchant Towboat Co., Ltd., to Caribe Tugboat Corporation.

2) The tugboat in question was delivered to charterer at New Orleans, Louisiana, on November 26, 1976. Charter hire commenced to accrue on the 8th day of December, 1976. On said date the tug left New Orleans for Puerto Rico under the command of Captain Robert A. Peters, a Caribe employee. As of December 31, 1976, the charter hire paid by Caribe to Shipowners was $21,600.00. On the day the accident occurred, the entire crew of the SEA RACER was under the employ of Caribe.

3) On the evening of December 17, 1976, the tug SEA RACER left Pier 9, San Juan Harbor, to go alongside a barge ramp or pier where it intended to take the Barge "SANTO DOMINGO" in tow to the U.S. Virgin Islands. At about 5:00 P.M., the crew under the command of Captain Robert A. Peters and Chief Mate Francisco T. Rivas started to make up the tow. There was a 90 foot surge chain on the barge, but the crew spent some time changing the same to a 45 foot surge chain. The crew stopped work and had supper.

4) After supper, the operation continued. Seamen Louis Lusson, Robert Bousson and Stephen Rivera worked on the stern of the tug making the tow. Departure from the barge pier was made at about 8:30 P.M. Up to this time the SEA RACER had been made fast to the barge by three lines in a conventional manner. The tug was backed slowly for about 100 feet with the surge chain still on deck. At this point, the tug stopped and the chain was dropped by slacking the brake on the tow winch. The tug was then brought ahead on a dead slow speed, full left rudder.

5) At the same time, the tow wire was slacked until by estimate of the Mate and crew there were 150 feet of wire out. During this operation the tug was operated on alternate speeds of dead slow and stop.

6) When only 150 feet of wire were out, the tow winch brake was tightened, taking a strain on the chain and turning the barge as expected. With the rudder amidship, still alternating between slow and stop, the tug and tow proceeded into the channel with the tow following.

7) We find that during this maneuver the Master was handling the tug from the bridge controls rather than from the stern controls from where he could have a full view of the operation taking place in the stern of the tug. We further find that at the moment the accident occurred, the Chief Mate had abandoned his position at the stern controls and winch controls. He went forward to the house or bridge to inform the Master that the towing wire was out. In this respect we also find that the stern control station provides an ideal location for the Master and Mate to maneuver the tug. The station's location high on the bridge level allows the Master and

1. The Court held two conferences in chambers to discuss with counsel the issues on remand and their respective positions related thereto. At trial the parties stipulated that the Court could consider as evidence all discovery on file.

2. Since the inception of this suit, defendant, Shipowners, has always sustained the position that it had bareboat chartered the tug SEA RACER and as such was not liable for any post demise unseaworthy condition. On appeal, one of plaintiff's main arguments was that there was no evidence in the record to sustain this point. Although this was one of the principal reasons for the remand, the Court need not address this point in any detail since prior to the hearings plaintiffs have stipulated the existence of a bareboat charter and the date of commencement. See finding numbered 14 at 13 *infra.*

Mate to direct the men working on the stern making up the tow while also permitting the officers to view with relative ease the area right in front of the tug and tow for a safe operation.

8) At the time the Mate went to the bridge to talk to the Captain, the three men on the stern were in the process of securing a hold down block which keeps the towing wire within the two port pins and on top of the wire roller assembly in normal towing conditions. The tug, fitted with a double drum towing winch was towing with the portside wire and portside pins.

9) We find that at this precise moment, when the stern of the tug was left unattended by both the Master and Mate, contrary to prudent and safe practice, seamen Lusson, Bousson and Rivera were engaged in putting the hold down block or gear on the towing wire to later secure it to the stern deck. The particular hold down block should have been already installed on the wire for an easy and safe securing operation. On this occasion, the Master and Mate had allowed the hold down gear to remain disassembled. As a result thereof, the three mentioned seamen had to put the hold down block high on the wire, pass a main pin through the block and a roller or sheave to secure it with a nut and cotter pin and then secure the block to the deck through a padeye onto a pelican hook. In order to carry out this operation starting with a dismantled block, the three men had to stand right over or near the level of the towing wire when it had tension on it.

10) When the Mate was at the bridge talking to the Master he heard the Captain say a man was overboard. He felt the tug jerk. The Mate went to the stern and saw Robert Bousson in the water drifting away. A life line with a strobe light was thrown into the water. The Mate and seaman Rivera jumped into the harbor waters and were able to put a life line on Bousson.

Seaman Lusson was also missing and could not be found. Both Lusson and Bousson died as a result of this accident.

11) The stipulated versions of testimony contained in the Statements of Peters, Rivas and Rivera, and the testimony received in Court from Rivera and Captain Lowell Bass, Jr., in light of the Coast Guard Report on the accident, including a letter requesting further action, subscribed by Attorney Arthur Abarbanel, representing plaintiffs, force us to conclude that the accident occurred due to the negligence of the Master and Mate; said negligence consisting in having sailed with a dismantled hold down gear and by having failed to operate the tug at the critical time when the accident occurred from the stern controls of the tug. From the stern control area, both Master and Mate had the three men on the stern in sight at all times and by their actions they could have avoided the tow wire from having jumped the towing pins launching [3] both Lusson and Bousson overboard. We further conclude that at the time of the accident Lusson and Bousson were standing in the bight side of the tow wire, thus having contributed to the occurrence in that sense. The bight side of the wire, referred to in the discovery as the dead man's side of the wire, is the area within an angle formed by the tow wire resting against a towing pin under tension. A towing cable under a strain is a very hazardous piece of equipment. The evidence shows that it is a known fact that prudent seamanship dictates that at all times the bight side of any wire should be avoided because of the danger involved. Keep low and stay out of the bight side is the basic rule of safety. If the tow wire should swing across the deck and you are low enough, it will pass over the seaman's head. Keeping out of the bight means to stay out of the eye or loop in a line; it also means to stay on the safe side of a line under tension. Negligence on the part of

---

**3.** Plaintiffs' expert witness stated that the action of the wire hitting the seamen was like a catapult effect. The Court recalls the hand motion by the witness related to his testimony indicating clearly that upon being hit by the wire the men were launched out of the tug. See Paragraph numbered 15 at 13, *infra*.

the crew employed by Caribe was the sole cause of the accident. Indeed, plaintiffs' own expert witness was brought to admit during cross examination that had the Captain and Mate been at the stern controls and Lusson and Bousson on the safe side of the wire, the accident would not have occurred. Caribe, as an insured employer under PRWACA, is immune from further liability.

■ 12) Even though we have no doubt about the fact that certain combined acts of negligence can be tantamount to unseaworthiness, *Mitchell v. The Trawler Racer, Inc.*, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), we cannot go as far as proposed by plaintiffs and rule that an unseaworthy condition preceded the date of the demise or bareboat charter, thus subjecting Shipowners to liability. *Ramos v. Beauregard, Inc., supra*. The great weight of credible expert testimony in light of all other evidence received does not allow this Court to find a pre-demise unseaworthy condition.

13) The tug SEA RACER was at the time Caribe took over control at New Orleans, Louisiana, in excellent operating condition and seaworthy in all respects. The testimony received so confirms. Furthermore, this Court cannot find any unseaworthiness as a matter of design of the tug which can be taken as a pre-demise condition. The design of the tug SEA RACER and the eventual upgrading of its towing pins to a hydraulic mechanism was made following accepted naval architecture and marine engineering principles in use throughout the industry.

The hydraulic pins make the towing operation easier and safer in all respects. The theory advanced by plaintiffs to the effect that the accident could have been avoided by having a locking device across the top of the two towing pins (referred to as norman pins) such as a flat piece of metal or "lips" on the pins which could be placed over the two pins in a locked position to serve as an additional permanent hold down gear is unacceptable. Said theory in its various forms ignores basic principles of tugboat design and operation which require that for safety and maneuverability an ocean going tug like the SEA RACER have the capability of being able to tow and/or maneuver with the pins fully retracted so as to allow the towing wire to move freely across the stern of the tug in certain conditions. Any locking device of the type proposed by the plaintiffs would affect tug maneuverability and would hamper immediate pin retraction. Furthermore, the safety of those called upon to handle and/or retract the locking device in case of need would be further endangered. The integrity of the towing wire, tug and tow could also be affected inasmuch as the proposed retention of the wire by "lips" or otherwise can materially interfere with pin retraction and cause damage to the wire. Those working on said device may have to stand next to the pins over the tow wire level with consequent exposure to the possibilities of the towing wire jumping the pins and causing an accident similar to the one we have described.[4] The system found on the SEA RACER allowed the pins to be fully retracted by remote hydraulic control from the stern control panel immediately leaving the stern free of obstructions. If needed, the hold down gear or block could be released by having a crewmember work under the bight of the wire to simply let go the block at the pelican hook. Furthermore, in an extreme case, after pins are fully retracted and even if the hold down gear remains in place and the Master decides not to send a man to the stern of the tug to effectuate the release at the pelican hook, the design of the block is such that it serves as weak link in the system. Forces created by the then free towing wire will snap the chain that retains the block allowing free towing with pins fully retracted.

4. Hold down gear and/or blocks are designed to keep the towing wire, a most important part of the tug and tow combination, between pins and moving over a roller assembly to keep wire damage to a minimum. We find that a tug equipped with hydraulic tow pins is a safer vessel.

The system of "lips" retention proposed by plaintiffs would be awkward, impractical and dangerous for the reasons stated.

14) We find that the allegation of unseaworthiness prior to the demise had as the only useful purpose keeping this case within the admiralty and maritime jurisdiction of this Court under 28 U.S.C. § 1333. As it pertains to Shipowners, the allegation is not well taken. Plaintiffs failed to convince this Court by credible evidence that the theory of pre-demise unseaworthiness had any merit in a practical context within the towing industry.

15) The remaining allegations of lack of adequate communication and visibility between the bridge and the stern of the vessel, as well as those pertaining to the bulwark designed height of the tug and engine speed modulation are utterly without merit in light of the finding made today. On direct examination plaintiffs' expert stated that the American Bureau of Shipping had in effect bulwark height regulations which were not followed by the designer of the tug SEA RACER. On cross-examination the witness had to admit that the so-called regulations were simply recommendations. He further admitted that the recommendation contemplated exemptions for particular boats where the design justified a difference. The evidence further showed that the SEA RACER is a classed vessel by the American Bureau of Shipping. In any event bulwark height was not a factor or cause in the accident. The men, when hit by the wire, were catapulted or launched out of the tug. The proposed bulwark height of 39½ inches rather than the existing 27 inches played no role of causation in the accident which is the object of this suit. The testimony of plaintiffs' expert to the effect that a higher bulwark would have prevented the injuries suffered by the seamen is totally speculative and contradictory to his own line of thought to the effect that the seamen were actually catapulted. A careful evaluation of the testimony on this aspect convinced this Court that a higher bulwark would have resulted in additional body trauma assuming that upon being hit by the wire the seamen would have been thrown against the bulwark, a steel structure.

The alleged failure on the part of the designer to provide an engine speed modulation control or clutch device ignored the fact that the tug was indeed provided with such a mechanism. The alleged failure to provide life jackets of a certain type ignored the fact that at all times the tug was equipped with U.S. Coast Guard approved life saving apparatus. The operational negligence of Caribe, which permeates plaintiffs' case, is of no avail to them in their pursuit of Shipowners as a potential defendant.[5]

16) The testimony of plaintiffs' only witness, Gerrit J. Van Dissel, merits a special finding. This naval architect and marine engineer was offered as an expert on tugboat design and operation. *Voir Dire* conducted by defendants, as well as testimony given during direct and cross examination, forces us to conclude that his qualifications in this field are dubious. His opinions were not sustained by industry standards or credible technical reasons of why the industry should adopt such standards. He could not point out having knowledge of any other tug or tugboat operation which had implemented the modifications which he suggested would make the SEA RACER a safer ship. Furthermore, the witness could not point out any learned treatise or technical publication which sustains his views. Finally, the witness' testimony was characterized by superficial, erroneous and mis-

---

5. The fact that the day of the accident the inboard starboard pin was inoperative and the outboard port pin would not go down, has no bearing on the occurrence. The SEA RACER was towing with the postside wire of its double drum towing winch and the two port pins were available and usable even though the outboard port pin could not be retracted. If at all, this further confirms operational negligence on the part of Caribe. Captain Peters should have demanded that the pins be operative before he departed on the voyage object of this suit.

**14**

leading references to other evidence, leaving doubt about his objectivity, impartiality and thoroughness of preparation. The witness' carriage, gestures, evasiveness and air of lack of impartiality confirm the above.

17) We further hold that a re-examination of *Garcia v. Friesecke* and the post *Lugo Sánchez* [6] case law decided by the Supreme Court of Puerto Rico does not change our initial holding that Shipowners qualifies as a statutory employer under PRWACA. *Garcia* consisted of several consolidated cases representing the various factual arrangements that at the time were found to establish a pattern in the then pending litigation before this District.[7] Charter party situations were included and the United States Court of Appeals for the First Circuit did not differentiate between the various factual situations presented except for a land based accident involving the consolidated case of *Rafael Claudio Torres v. Sea-Land Service, Inc.* See *Garcia*, at note 1 and at 295. We find nothing in the opinion which ordered the remand of this case which changes the general rule enunciated in 1979. As a matter of fact, the issue of statutory employer was left open for further determination by this Court. We now decide that even in the context of a bareboat charter party Shipowners & Merchant Towboat Co., Ltd., is protected by the statutory employer doctrine for the negligent acts which led to the casualty which is the object of this lawsuit.

WHEREFORE, based on the findings and conclusions made today, judgment shall be entered for defendant Shipowners & Merchant Towboat Co., Ltd., dismissing the complaint filed by plaintiffs. In accordance with Rule 54(d) of the Federal Rules of Civil Procedure costs shall be allowed in favor of defendant.

IT IS SO ORDERED.

6. *Lugo Sánchez v. Puerto Rico Water Resources Authority,* 105 DPR 861 (1977).

7. The purpose in making a selection of representative cases was to have the precedent or rule of law that was about to be adopted apply to all pending litigation.